[No. S019786. June 18, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL CLARENCE BOLIN, Defendant and Appellant.

## COUNSEL

Richard C. Gilman, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Ward A. Campbell, Shirley A. Nelson and Rachelle A. Newcomb, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

BROWN, J.—A jury convicted defendant Paul Clarence Bolin of two counts of first degree murder (Pen. Code, § 187; further unspecified statutory references are to the Penal Code), one count of attempted first degree murder (§§ 187, 664), and one count of cultivation of marijuana (Health & Saf. Code, § 11358). It found true allegations of personal firearm use (§§ 1203.06, subd. (a)(1), 12022.5) and a prior serious felony conviction (§ 667, subd. (a)). The jury also returned a true finding on the special circumstance allegation of multiple murder (§ 190.2, subd. (a)(3)) and set the penalty at death. The trial court denied defendant's motion to modify the sentence (§ 190.4, subd. (e)). This appeal is automatic (§ 1239).

### I. FACTS

#### A. *Guilt Phase*

The crimes occurred Labor Day weekend of 1989, when defendant was living in a small cabin located in a secluded mountainous area of Walker Basin in rural Kern County. Vance Huffstuttler also lived on the property in a trailer. Together they cultivated marijuana defendant had planted nearby. Defendant had taken on Huffstuttler as an assistant in the marijuana venture and intended to give him a portion of the profits when they sold the crop.

On Friday, September 1, Steve Mincy and Jim Wilson drove from Garden Grove to a campsite owned by Mincy's father, Robert, near Twin Oaks, also in Kern County. Robert and several other family members and friends had already arrived and were planning to spend the weekend. The next day, Wilson went for a bicycle ride and then met Steve Mincy at a bar in Twin Oaks. Mincy was there drinking with several others, including Vance Huffstuttler; defendant was also among the group. Later, Wilson returned to the campsite, where he agreed to drive Huffstuttler back to his trailer; Mincy accompanied them.

According to Wilson's trial testimony, the trip to Walker Basin took about 45 minutes in his truck, including 30 minutes on rough dirt roads leading into defendant's property. Defendant had already returned to his cabin. Upon

arriving, Mincy, Wilson, and Huffstuttler saw him there with Eloy Ramirez, a friend of defendant's who was blind in one eye. When they got out of the truck, Huffstuttler took Mincy and Wilson across a creek bed and showed them numerous marijuana plants under cultivation. Defendant followed shortly thereafter and confronted Huffstuttler about bringing strangers to the location. Wilson testified defendant became "pretty agitated" and began arguing with Huffstuttler. The two returned to the other side of the creek bed toward the cabin, out of Wilson's view, still arguing. Wilson then heard a gunshot from that direction. A moment later, he and Mincy saw defendant appear from behind a line of trees holding a revolver and saying he had "nothing against" them. As Wilson turned and ran, defendant fired a shot that hit him in the shoulder. He heard several more shots as Mincy begged for his life.

According to Ramirez's testimony, when defendant and Huffstuttler returned across the creek bed arguing, defendant went into the cabin and came out with a revolver. Huffstuttler asked, "What are you going to do, shoot me?" Defendant did not respond, but instead fired one shot at close range. Huffstuttler fell to the ground and did not move. Defendant then approached Mincy and Wilson and fired several more rounds. Back at the cabin, he took a rifle and shot at Huffstuttler's inert body. He also took other steps to make the scene appear like the result of a drug deal gone bad. Ramirez refused to assist him. When defendant finished, they both left for Southern California.

Meanwhile, after traveling all night over the mountainous terrain, Wilson found his way to a neighboring ranch, where the owner called the sheriff's office. When sheriff's deputies went to defendant's cabin, they found Huffstuttler's body lying near Wilson's truck; Mincy's body was in the creek bed in a fetal position. Both had several fatal gunshot wounds; Huffstuttler had been shot with both a revolver and a rifle. The area inside and outside the cabin was in disarray with broken bottles and marijuana paraphernalia as well as some loose marijuana scattered about. The revolver, wiped clean of fingerprints, was found near Huffstuttler. A knife was found nearby as well. Spent shell casings and bullets were retrieved from near each body. At trial, Criminalist Gregory Laskowski determined that grooves in the bullets were consistent with having been fired from the .45-caliber weapon found at the scene. He also testified that blood spatters around Mincy's body indicated some gunshot wounds had been inflicted while he was running and at least one other while he was in a fetal position.

Despite an extensive search, law enforcement was unable to locate defendant for several months. Authorities eventually arrested him in Chicago, where he had been living with friends and family members: Sheriff's

deputies also traced the whereabouts of Eloy Ramirez to the house of his girlfriend, Patricia Islas, in Covina, where he had gone after the killings. At trial, Ramirez corroborated the description of events recounted by Wilson.

The defense presented no evidence at the guilt phase.

## B. Penalty Phase

### 1. Prosecution Evidence

At the penalty phase, the prosecution presented evidence of two instances of violent criminal conduct—an unadjudicated assault with great bodily injury of Matthew Spencer and the attempted manslaughter of Kenneth Ross, for which defendant was convicted and sentenced to prison. The prosecution also submitted a threatening letter defendant wrote to Jerry Halfacre while incarcerated awaiting trial. Halfacre had previously had a relationship with defendant's daughter, Paula, and was the father of her child. Among other things, the letter warned Halfacre not to see Paula again or defendant would have him "permanently removed from the face of this Earth." Halfacre had given the letter to his probation officer, who transferred it to a Kern County District Attorney investigator.

### 2. Defense Evidence

In addition to testimony that defendant had acted under provocation in the incidents involving Spencer and Ross, the defense presented evidence of his upbringing. Defendant's parents divorced when he was eight years old, and within a few years neither wanted to care for him. He lived on the street until he was 16 years old when he joined the Navy and went to Vietnam. Defendant's two daughters testified he had raised them from young ages when their mother abandoned them. Defendant also raised his stepdaughter, Pamela Castillo, after he and her mother were divorced. Other family members and friends recounted how defendant had helped them in various ways.

## II. Discussion

### A. Pretrial Issues

### 1. Change of Venue Motion

Prior to trial, defendant moved for a change of venue due to pretrial publicity about the case. Not only had the local television and print media

given the killings substantial coverage, the program, *America's Most Wanted*, featured a television reenactment of the crimes during a segment aired just prior to defendant's arrest. The broadcast apparently led to his identification in Chicago as the alleged perpetrator, and a second airing shortly thereafter described his apprehension. In support of the motion, defendant submitted videotaped copies of the television episodes as well as local news clippings reporting the crimes. ■ At the hearing on the change of venue motion, defense counsel also referred to the results of a public opinion survey the defense had undertaken in Kern County. Based on the survey, counsel represented that 45 percent of the people responding indicated they had some knowledge of the case due to the media attention. Of this number, 20 percent had seen the *America's Most Wanted* reenactment.

Initially, we address defendant's claim counsel was ineffective for failing to make a sufficient record in support of the motion because he failed to have the public opinion survey entered into evidence. We find no deficiency. (See *post*, at p. 333.) The trial court had a copy of the survey for its consideration. Counsel orally represented the statistical information he deemed most vital to the motion. Since the prosecutor offered no contradiction, we have concluded those representations were accurate and accepted them as part of the record, but for the reasons discussed below find them irrelevant to our determination of this issue. Defendant fails to identify any other materials that would have bolstered his motion.

After considering the materials presented, the trial court found only the initial television episode a possible basis for granting a change of venue, expressing concern that psychologically those who had watched the reenactment would be unable to set aside its impact. Nevertheless, the court tentatively denied the motion and reserved final ruling to see the number of prospective jurors who had actually viewed it and their reactions. At the close of voir dire, defendant accepted the jury with 16 peremptory challenges remaining, notwithstanding the fact 3 jurors had seen the crime scene dramatization on *America's Most Wanted*.[1] Because he never raised the issue again or sought a definitive ruling, his claim on appeal is procedurally barred.

■ This court has long held "that it is no error for the trial court to postpone the consideration of an application for a change of venue until an attempt is made to impanel the jury, where leave is granted to counsel to renew his application if the facts disclosed . . . warrant it, and . . . where counsel fails thereafter to renew his motion, he cannot claim . . . error was

---

[1]Defendant asserts Jurors Barnes, Hanson, Bowles, and Vaughn indicated they had viewed the reenactment. According to the record, however, Barnes denied having seen it.

committed by the court in failing to order a change of venue. In those cases it was held . . . that the failure to renew his motion, where it was denied temporarily only, was an abandonment and waiver of the whole question, and fatal to any claim based upon the original application." (*People* v. *Staples* (1906) 149 Cal. 405, 412 [86 P. 886], overruled on other grounds in *People* v. *Newland* (1940) 15 Cal.2d 678 [104 P.2d 778].) Here, denial of defendant's motion was expressly conditioned on the extent to which the television reenactment might have influenced the attitudes of prospective jurors. As the court explained, "This is tentative." "I want to see first of all how many perspective [*sic*] [jurors] we get who actually have seen this video . . . . [¶] So your motion is reserved . . . ." As in *Staples*, "no ultimate disposition of the motion was made, and defendant was accorded the right to subsequently renew his motion. He did not do so, and he cannot, within the rule of [cases cited in *Staples*], now insist that the court erred, when his right to move was only postponed, and he did not see fit to avail himself of his opportunity to subsequently renew the motion." (149 Cal. at pp. 412-413.)

In the alternative, defendant contends counsel rendered ineffective assistance for failing to press for a definitive ruling. As will appear, this is the first of many instances in which he attempts to transmute a failure to preserve an issue for appeal into a claim of attorney incompetence. We therefore note some preliminary considerations in this regard. Although the Constitution does not demand an error-free trial, this case came close to meeting that exacting standard, perhaps because there were so few opportunities for error. With two eyewitnesses to the killing, the defendant's state of mind and intent were the only issues open to question. The forensic evidence bearing on those elements was straightforward, to the point, and not susceptible to much controversy. The guilt phase was matter-of-fact in tenor, and the penalty phase was presented and argued without inflammatory rhetoric or vilification.

Under the circumstances, defense counsel had few viable options, but made reasonable efforts to negate first degree murder despite considerable factual impediments. With more evidentiary leeway at the penalty phase, counsel marshaled a respectable array of family and friends to attest to defendant's good qualities and plead for his life. They could not, however, change the fact that defendant had turned a deaf ear to similar pleas from Steve Mincy.

Notwithstanding these efforts, the jury found death the appropriate punishment for defendant's crimes. Our Constitution thus mandates an appeal, but the hurdles for appellate counsel were formidable on these facts. Understandably, one strategy in such circumstances is to identify, with the acuity

of hindsight, every aspect trial counsel could arguably have handled differently. "[I]n a painstaking search of any record, a zealous appellate counsel can find areas in which he would quibble with trial counsel." (*In re Lower* (1979) 100 Cal.App.3d 144, 147 [161 Cal.Rptr. 24].) Recognizing the adverse impact on effective advocacy, the courts have long cautioned against such intrusive posttrial inquiry and second-guessing of trial counsel. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 690 [104 S.Ct. 2052, 2066, 80 L.Ed.2d 674]; *People* v. *Brooks* (1966) 64 Cal.2d 130, 140 [48 Cal.Rptr. 879, 410 P.2d 383].) ■ Counsel's performance is "a question of judgment and degree that must be assessed in light of all the circumstances of the case and with a view to fundamental fairness." (*People* v. *Whittington* (1977) 74 Cal.App.3d 806, 820 [141 Cal.Rptr. 742].)

■ Evaluating the record in light of these principles, we find no incompetence. Counsel's failure to renew the change of venue motion did not result from ignorance or inadvertence and reflected a reasonable trial strategy. (See *post*, at p. 333.) The impact of the pretrial publicity generally and the *America's Most Wanted* episodes in particular was a critical focus of the voir dire. Although many prospective jurors had been exposed to some pretrial publicity, including the segment reenacting the killings, for the most part few recalled the specifics or had formed a resolute impression of defendant's guilt. In particular, those who eventually sat on the jury all gave assurances they would decide the case based solely on the courtroom evidence. (See *post*, at p. 316.)

In light of these responses, counsel could well have recognized the effect of the publicity had not been as substantial as feared, especially after an 11-month interim. Thus, renewed effort to seek a change of venue would be futile since the trial court had conditioned any change in its tentative ruling on a determination the television coverage had impaired the ability to assemble an impartial jury. In addition, the reenactment was relevant only to the guilt phase portion of the trial. With guilt virtually a foregone conclusion, counsel's concern may at that point have turned to the penalty phase, which was substantially insulated from the effect of pretrial publicity. (Cf. *People* v. *Cox* (1991) 53 Cal.3d 618, 661-662 [280 Cal.Rptr. 692, 809 P.2d 351].) Given the possibility of a valid trial tactic, we reject this claim of ineffective assistance. (*People* v. *Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

2. *Refusal to Excuse Jurors for Cause*

The trial court granted only some of defendant's numerous challenges for cause. He now contends the court erroneously failed to excuse five prospective jurors who eventually heard the case. As noted, the defense had exercised only four of its twenty peremptory challenges when it indicated no

further objection to the jury as constituted. ■ " 'It has long been the rule in California that exhaustion of peremptory challenges is a "condition precedent" to an appeal based on the composition of the jury. [Citation.]' " (*People* v. *Coleman* (1988) 46 Cal.3d 749, 770 [251 Cal.Rptr. 83, 759 P.2d 1260].) "Defendant's right to a fair and impartial jury is not compromised as long [as] he could have secured the juror's removal through the exercise of a peremptory challenge." (*People* v. *Lucas* (1995) 12 Cal.4th 415, 480 [48 Cal.Rptr.2d 525, 907 P.2d 373]; cf. *Ross* v. *Oklahoma* (1988) 487 U.S. 81, 85-88 [108 S.Ct. 2273, 2276-2278, 101 L.Ed.2d 80].) Accordingly, "California courts hold that the defendant must exercise his peremptory challenges to remove prospective jurors who should have been excluded for cause, and that to complain on appeal of the composition of the jury, the defendant must have exhausted those challenges. [Citation.]" (*People* v. *Coleman, supra,* 46 Cal.3d at p. 770; *People* v. *Raley* (1992) 2 Cal.4th 870, 904-905 [8 Cal.Rptr.2d 678, 830 P.2d 712].) Defendant did not do so; he may not now claim error.

Acknowledging these principles, but citing dictum in *People* v. *Lucas, supra,* 12 Cal.4th at page 481, footnote 13, defendant argues alternatively that the trial court had a sua sponte duty to excuse biased jurors when counsel failed to do so. Whatever the language in *Lucas* may imply, this court has never imposed on the trial court an independent, affirmative obligation to excuse a prospective juror notwithstanding counsel's failure to exercise a peremptory challenge for that purpose. The decisional and statutory authorities cited do not support that proposition. (See former Code Civ. Proc., § 223, enacted by Stats. 1988, ch. 1245, § 2, p. 4148 and repealed by initiative measure, Prop. 115, § 6, passed by voters at Primary Elec. (June 5, 1990); former Pen. Code, § 1078, enacted 1872 and repealed by Stats. 1988, ch. 1245, § 36, p. 4155; *People* v. *Mattson* (1990) 50 Cal.3d 826, 845 [268 Cal.Rptr. 802, 789 P.2d 983]; *Morgan* v. *Illinois* (1992) 504 U.S. 719, 729-730 [112 S.Ct. 2222, 2229-2230, 119 L.Ed.2d 492].)[2] ■ While the authority to control voir dire includes the power to excuse prospective jurors

---

[2]The apparent source of the misperception the trial court has a sua sponte obligation is the statement in *People* v. *Mattson, supra,* 50 Cal.3d at page 845: "The duty to examine prospective jurors *and* to select a fair and impartial jury is a duty imposed on the court . . . . (Code Civ. Proc., [former] § 223, subd. (a); Pen. Code, former § 1078.)" (Italics added.) This statement is, in fact, a misreading of the statutes cited, which did not contain the italicized conjunctive. Instead, they provided, "It shall be the duty of the trial court to examine the prospective jurors to select a fair and impartial jury." (Former Pen. Code, § 1078.) This language, as well as related statutory provisions, made clear the obligation at issue concerns the voir dire process, not the ultimate selection of the jury. Former Code of Civil Procedure section 223, subdivision (a), which replaced former Penal Code section 1078 (Stats. 1988, ch. 1245, § 36, p. 4155), has since been repealed by Proposition 115. The current statute contains no reference to the court's "duty" or selection of a fair and impartial jury and expressly addresses only the court's control of voir dire. (Code Civ. Proc., § 223.)

for cause (see *People* v. *Jimenez* (1992) 11 Cal.App.4th 1611, 1621 [15 Cal.Rptr.2d 268], disapproved on other grounds in *People* v. *Kobrin* (1995) 11 Cal.4th 416 [45 Cal.Rptr.2d 895, 903 P.2d 1027]), it does not impose a sua sponte duty to do so. We thus decline to excuse defendant's failure to preserve this issue for review. (See *People* v. *Avena* (1996) 13 Cal.4th 394, 413 [53 Cal.Rptr.2d 301, 916 P.2d 1000].)

We also reject defendant's passing suggestion that defense counsel rendered ineffective assistance in failing to utilize all available peremptory challenges. "[T]he decision whether to accept a jury as constituted is obviously tactical, and nothing on the appellate record demonstrates counsel's tactical choice here was either unreasonable or prejudicial." (*People* v. *Lucas, supra*, 12 Cal.4th at p. 480.) We have reviewed the voir dire of the jurors in question. Whether or not they had been exposed to any pretrial publicity, including viewing *America's Most Wanted*, each gave credible assurances he or she would decide the case based only on what transpired in the courtroom.

### 3. *Exclusion of Hispanics From the Petit Jury*

Defendant contends the prosecutor improperly utilized three peremptory challenges to exclude prospective jurors with Hispanic surnames.[3] (See *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]; *Batson* v. *Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69].) At trial, counsel failed to make a *Wheeler* motion. This omission waives the right to complain on appeal. (*People* v. *Gallego* (1990) 52 Cal.3d 115, 166 [276 Cal.Rptr. 679, 802 P.2d 169].)

Alternatively, defendant argues the trial court had a sua sponte duty to question the prosecutor's use of peremptory challenges based on the court's general obligation to ensure a fair jury. He cites no authority in support of this argument. (See *ante*, at pp. 314-316.) Moreover, it conflicts with the procedure set forth in *Wheeler* allocating to the aggrieved party the burden of raising the point in a timely fashion and making a prima facie case of

---

[3]In conjunction with this claim, defendant also argues other Hispanics were improperly excused because of financial hardship. Even if defendant had preserved this contention by an appropriate objection (see *People* v. *Champion* (1995) 9 Cal.4th 879, 907 [39 Cal.Rptr.2d 547, 891 P.2d 93]), this court has consistently held such excusals do not violate the Sixth Amendment right to a fair and impartial jury drawn from a representative cross-section of the community because "persons with low incomes do not constitute a cognizable class. [Citations.]" (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1214 [255 Cal.Rptr. 569, 767 P.2d 1047].) Thus, counsel was not ineffective for failing to object to these excusals. (See *post*, at p. 333.) We also find no incompetence for not challenging "the jury selection system in Kern County, the method by which the jury pool was assembled, and the sources used for summoning jurors to court." Nothing in the record establishes such efforts would have been successful.

impermissible discrimination. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 280.) ■ Whatever the obligations of the trial court to control the jury selection process, the defendant must comply with procedural prerequisites to preserve any error for appeal. (*People* v. *Avena, supra,* 13 Cal.4th at p. 413.) Absent an appropriate challenge to the prosecutor's exercise of peremptories, the issue is not preserved. (Cf. *People* v. *Ramos* (1997) 15 Cal.4th 1133, 1160 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

Defendant makes a related claim of ineffective assistance of counsel for failing to preserve the *Wheeler* issue. On this record, we are unable to determine the reason counsel did not make a timely challenge. He may have perceived the prosecutor could adequately rebut the charge, or he himself may have been dissatisfied with the individuals excused. Since the decision may well have been "an informed tactical choice within the range of reasonable competence, the conviction must be affirmed. [Citation.]" (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

#### 4. *Prosecutor's Use of Peremptory Challenges to Excuse Jurors With Scruples About the Death Penalty*

Relying primarily on *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776] and *Wainwright* v. *Witt* (1985) 469 U.S. 412 [105 S.Ct. 844, 83 L.Ed.2d 841], defendant contends the prosecutor violated various constitutional rights by using peremptory challenges to excuse prospective jurors who expressed scruples about imposing the death penalty. *Witherspoon* and *Witt* set forth the standard for determining whether the trial court properly excused prospective jurors for cause based on their attitudes toward capital punishment. (See, e.g., *People* v. *Cox, supra,* 53 Cal.3d at pp. 645-648.) With respect to peremptory challenges, this court has consistently held such excusals do not implicate any constitutional guaranty. (See, e.g., *People* v. *Champion, supra,* 9 Cal.4th at p. 907.) Defendant offers no persuasive reason to reexamine that determination. Consequently, counsel was not ineffective for failing to make an objection. (See *post,* at p. 333.)

### B. *Guilt Phase Issues*

#### 1. *Juror Observations of Defendant in Shackles*

■ Defendant contends he was denied his right to a fair trial because on two occasions certain jurors observed him manacled. The record discloses no error.

On the first occasion, one of the jurors arrived at the courtroom prior to the commencement of trial for that day. The bailiff directed him to the jury

room pending the completion of other court business. Unbeknownst to the bailiff, defendant was in the jury room sitting in a chair handcuffed and shackled. The juror immediately came out and informed the court of defendant's presence. The court instructed the juror not to discuss the matter and to wait in the hall. After informing counsel of the incident, the court held a voir dire examination during which the juror indicated in response to questioning by the court and defense counsel that he was in the jury room about a minute and a half and did not observe whether defendant was restrained in any manner. The juror also affirmed the encounter had not affected his impartiality. Prior to the voir dire examination, defense counsel had already represented he did not think the incident warranted juror disqualification. Thereafter, he did not suggest the examination had changed his mind. Nor does anything in the record support defendant's current claim.

The second incident occurred following the guilt phase. Counsel represented that defendant had been brought into court and was being unshackled when three jurors walked into the courtroom. The bailiff immediately turned them around and sent them out. According to counsel, "it happened so quickly" and he was "not going to raise that as an issue." The court conducted individual voir dire examinations of the three jurors. One juror said she saw "just people's heads" and "wasn't really looking." Another "didn't see anybody but backs of heads" and did not know who was in the courtroom. The third juror saw defendant standing with his back toward the doorway. He did not notice anything about his dress, his manner, or what he was doing.

Following the examination, counsel did not indicate he had changed his mind. (Cf. *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 583 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) Again, nothing in the record supports a contrary view. Neither incident could have affected defendant's right to a fair trial. (*People* v. *Cox, supra*, 53 Cal.3d at p. 652.) Moreover, since no juror saw him in restraints, the court had no obligation to instruct on the point.

2. *Evidence Issues*

a) *Police and autopsy photographs*

Over defense objection, the trial court admitted into evidence three photographs of Mincy's body, which Criminalist Gregory Laskowski utilized to illustrate his testimony about blood spatters and drips found at the

crime scene.[4] Defendant renews his contention these photos were cumulative and more prejudicial than probative due to their "gruesome" nature. (Evid. Code, § 352.)

The admission of photographs of a murder victim lies within the sound discretion of the trial court, exercise of which will not be disturbed on appeal absent a showing of abuse, i.e., that their probative value is clearly outweighed by their prejudicial effect. (*People* v. *Sanders* (1990) 51 Cal.3d 471, 514 [273 Cal.Rptr. 537, 797 P.2d 561].) In overruling the objection, the court here characterized the evidence as "highly relevant" because Laskowski used all three pictures to explain how he concluded from the blood spatters and drips that Mincy had been in motion when defendant fired some of the shots. In the court's view, "it certainly goes to the issue of intent and premeditation and planning . . . ." These conclusions reflect a proper exercise of the court's discretion. Since identity was not at issue, defendant's state of mind was critical to the charge of first degree murder (see *People* v. *Scheid* (1997) 16 Cal.4th 1, 18-19 [65 Cal.Rptr.2d 348, 939 P.2d 748]), and firing at a fleeing victim reasonably reflects an intention to kill. (Cf. *People* v. *Ramos, supra,* 15 Cal.4th at p. 1170.) Moreover, even though the pictures served to corroborate a testimonial witness, they were not cumulative since the photographic evidence could assist the jury in understanding and evaluating that testimony. (*People* v. *Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610]; see also *People* v. *Crittenden* (1994) 9 Cal.4th 83, 133 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Indeed, Laskowski's testimony may have made little sense without appropriate illustration. We have examined the exhibits and also do not find them unduly gruesome.

For the first time on appeal, defendant contends the court's ruling violated his rights under the Eighth and Fourteenth Amendments to the federal Constitution. Because he failed to object on these grounds at trial, the claim is not preserved. (*People* v. *Ramos, supra,* 15 Cal.4th at p. 1170.)

b) *Testimony by Jim Wilson*

 Defendant objected to testimony by Wilson concerning his actions after fleeing the scene of the shootings, arguing it was irrelevant and more

---

[4]Apparently on the strength of his pretrial motion, defendant challenges on appeal the admission of a total of 13 photographs. At defense counsel's request, the court deferred ruling on the motion until the photographs had been marked. When the exhibits were eventually offered into evidence, counsel only objected to four photos, one of which the court excluded. Accordingly, he may not now claim error in the admission of any other photos. (Evid. Code, § 353, subd. (a); cf. *People* v. *Morris* (1991) 53 Cal.3d 152, 187-190 [279 Cal.Rptr. 720, 807 P.2d 949], disapproved on other grounds in *People* v. *Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].)

prejudicial than probative. (Evid. Code, §§ 351, 352.) The prosecutor countered that the evidence of the all-night flight through the mountains was relevant to the charge of attempted murder and on the question of premeditation and deliberation because Wilson's actions reflected his perceptions of defendant's murderous intentions and state of mind. The trial court admitted the evidence on that basis.

We find no abuse of discretion in the ruling. Wilson's testimony was relevant primarily in that his description of events following his flight completed that portion of the overall narrative and explained when and how law enforcement initiated their investigation. A full rendition of the details also bolstered his credibility by demonstrating his ability to recollect accurately despite the trauma of the shooting. Nor was the testimony unduly prejudicial. Wilson's actions were a natural reaction to defendant's unprovoked assault. The testimony was short and relatively dispassionate, with no particular danger of evoking the jury's unwarranted sympathy. Moreover, since the jury eventually viewed the scene, they could reasonably have inferred the nature of Wilson's escape ordeal even if he had not testified.

■ Defendant also challenges as inadmissible hearsay Wilson's testimony regarding Mincy's pleas for his life. Because he failed to make an appropriate objection, the issue is waived. (Evid. Code, § 353, subd. (a).) In any event, the evidence was not hearsay. Mincy's words were not offered to prove the truth of the statements but the fact of the statements. (Evid. Code, § 1200.) Nor were they unduly prejudicial. Because they reflected defendant's deliberate callousness, they were particularly relevant to his intent and the issue of premeditation. "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.'" (*People* v. *Yu* (1983) 143 Cal.App.3d 358, 377 [191 Cal.Rptr. 859].) Counsel thus was not incompetent for failing to object.

### c) *Testimony of Patricia Islas*

■ After the killings, Ramirez went with defendant to the house of Patricia Islas, a friend who lived in Covina. Over a hearsay objection, Islas testified that when defendant left her house, Ramirez told her defendant had shot three men, including Huffstuttler, and described the shootings. The prosecutor argued Islas's testimony was a prior consistent statement necessary to rehabilitate Ramirez's testimony following cross-examination. The trial court overruled the objection on that basis.

Evidence Code section 1236 authorizes the admission of hearsay if the statement is consistent with a witness's trial testimony and is offered in

compliance with Evidence Code section 791. Evidence Code section 791 allows a prior consistent statement if offered after "[a]n express or implied charge has been made that [the witness's] testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (*Id.*, subd. (b).) The trial court correctly ruled Islas's testimony came within this exception. On cross-examination of Ramirez, defense counsel elicited testimony he had given his account of events implicating defendant in the killings only after he himself had been charged with two counts of murder and after he had spoken with his attorney. He was then released from custody and the charges were dropped. Impliedly, the defense was attempting to undermine Ramirez's credibility by suggesting his attorney had encouraged him to fabricate the accusations against defendant. Since the statements to Islas were made before that motive arose, they were properly admitted under Evidence Code section 1236. (See also *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1014 [248 Cal.Rptr. 568, 755 P.2d 1017].)

### d) *Testimony of Criminalist Gregory Laskowski*

Utilizing photographs of the crime scene, Criminalist Laskowski testified regarding the various positions of Mincy's and Huffstuttler's bodies when they were shot. Based on blood spatters and drips depicted in the photos, he indicated one shot was to Mincy's body while in a "fetal-like" position on its left side; as to the others, his body was in a vertical position. Laskowski also concluded Mincy "was moving at a relatively rapid pace" after being initially wounded. With respect to Huffstuttler, he determined that for several shots the body was prone and not moving. Defendant now contends this evidence was inadmissible because the witness was not qualified to render an expert opinion (Evid. Code, § 720) and because he did not personally investigate the crime scene. He further asserts it should have been excluded pursuant to Evidence Code section 352. Since he failed to make these objections at trial, the issue is waived. (Evid. Code, § 353, subd. (a); see *People* v. *Rodriquez* (1969) 274 Cal.App.2d 770, 776 [79 Cal.Rptr. 240].)

We also reject defendant's related claim counsel was incompetent for failing to challenge the evidence; any objection would have been properly overruled. Evidence Code section 720 provides that a person may testify as an expert "if he has special knowledge, skill, experience, training, or education sufficient to qualify him," (*id.*, subd. (a)) which "may be shown by any otherwise admissible evidence, including his own testimony." (*Id.*, subd. (b).) The trial court's determination of whether a witness qualifies

as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse. (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 357 [233 Cal.Rptr. 368, 729 P.2d 802].) " 'Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility.' " (*Seneris* v. *Haas* (1955) 45 Cal.2d 811, 833 [291 P.2d 915, 53 A.L.R.2d 124].)

The record establishes Laskowski was fully qualified to testify based on his educational background in biochemistry and serology and his training as a criminalist for 13 years, including attending and giving seminars in blood-spatter analysis and crime scene investigation. He had also testified as an expert witness on numerous prior occasions. Given his expertise, Laskowski's testimony was not cumulative. Utilizing his knowledge of blood spatters and drips, he was better able to describe the particulars of what occurred during the shooting of Huffstuttler and Mincy than any photographic depiction of their bodies. For example, he concluded from the spatter evidence that Mincy was moving around after he was first shot and before he fell into a fetal position, where he was shot one more time. He also explained that the large pool of blood around Huffstuttler's body indicated he was prone and not moving when he received the final shots. As discussed in other contexts, this evidence was relevant to the issues of intent and premeditation and deliberation. The photographs Laskowski referred to adequately illustrated his testimony; therefore, the fact he did not personally examine the crime scene was a matter of evidentiary weight. Since his testimony was admissible on all grounds, counsel had no basis for objecting.

e) *Testimony by Mincy family members*

Mincy's father, Robert, and cousin, Shelly Barber, presented evidence at the guilt phase. Defendant now claims their testimony was objectionable under Evidence Code section 352. Because he did not raise this challenge at trial, the issue is waived. We also reject the claim counsel was incompetent for failing to object. These two witnesses were at the Mincy family campsite for the Labor Day weekend and were present during various activities involving Mincy, Wilson, and Huffstuttler preceding their departure for defendant's cabin. Their testimony filled in the chronology of events from Friday evening through Saturday afternoon. It does not appear from the record that either witness was unduly emotional or likely to evoke an inappropriate response from the jury as to defendant's guilt, especially in a case in which identity was not at issue. Defendant complains of testimony that as he left with Wilson and Huffstuttler, Mincy told his daughter he would return shortly and take her to a dance that evening. This brief statement was insufficient to inflame the jury.

### 3. *Jury View*

At the prosecutor's request and with the express agreement of the defense, the jury was taken to defendant's cabin to view the scene of the crimes accompanied by the court, counsel, a court stenographer, and Sheriff's Deputies Layman and Williamson, who acted as bailiffs. For the first time on appeal, defendant contends Layman and Williamson were impermissibly allowed "to provide testimony regarding the crime scene, which they had investigated." He argues this "testimony" violated provisions of section 1119 requiring that the officer charged with conducting the jury to the place of the view "must be sworn to suffer no person to speak or communicate with the jury, nor to do so himself or herself, on any subject connected with the trial . . . ."[5] We find no error.

When the jury arrived at the scene, the court indicated "we are not going to take any testimony at this time." The jurors were then permitted to walk around the area, including where the marijuana plants had been growing, but were admonished not to discuss the case. After the jurors had looked around for an unspecified time, the court inquired, "Do any of you have any questions?" One juror asked for the location of the trailer where Huffstuttler had lived, which defense counsel indicated. Thereafter, on inquiry primarily from the court, Layman and Williamson, who had originally investigated the crime scene, pointed out the location of Wilson's truck, Huffstuttler's body, a woodpile, and the main road into the cabin area, all of which had been testified to in court. Williamson also described the foliage as taller at the time of the investigation, obscuring the view of the marijuana plants from the cabin.

 Because defendant failed to object to any aspect of the jury view, he cannot raise further challenge on appeal. (*People* v. *Pompa* (1923) 192 Cal. 412, 422 [221 P. 198]; *People* v. *Fitzgerald* (1902) 137 Cal. 546, 550 [70 P. 554].) "[W]here, as in the present instance, no objection is made to the appointment of the person showing parts of the premises, the defendant cannot later complain. In putting certain questions to the 'shower,' the trial judge intended to clarify and expedite the proceedings; as to any other alleged irregularity at the scene of the view . . . , there can be no contention

---

[5]Section 1119 provides in relevant part: "When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, or any personal property which has been referred to in the evidence and cannot conveniently be brought into the courtroom, it may order the jury to be conducted in a body, in the custody of the sheriff or marshal . . . to the place, or to the property, which must be shown to them by a person appointed by the court for that purpose; and the officer must be sworn to suffer no person to speak or communicate with the jury, nor to do so himself or herself, on any subject connected with the trial . . . ."

on appeal that there was error, for the silence of the defendant's counsel in those circumstances constitutes a waiver. [Citations.]" (*People* v. *Walther* (1968) 263 Cal.App.2d 310, 323 [69 Cal.Rptr. 434]; *People* v. *Pompa, supra,* 192 Cal. at p. 422.)

 In any event, the trial court conducted the jury view in full conformance with the provisions of section 1119, which expressly provides that when the court determines a jury view of the scene is proper, the place or property "must be shown to them by a person appointed by the court for that purpose . . . ." Originally, in *People* v. *Green* (1878) 53 Cal. 60, 61, this court construed the statute to preclude any person, even on direction of the trial court, from speaking to the jury on any subject connected with the trial. In *People* v. *Bush* (1887) 71 Cal. 602, 606 [12 P. 781], however, this rigid construction was rejected as illogical and inconsistent with the statutory language: "[W]e cannot conceive how [the shower] could have shown the jury the . . . places which they were sent to view in any other way [than pointing out and naming such places], under the statute." (See *People* v. *Milner* (1898) 122 Cal. 171, 185 [54 P. 833].) For more than a century, courts have consistently applied this interpretation, implicitly recognizing that the admonition that "no person . . . speak or communicate with the jury" (§ 1119) is plainly directed to insulating the jury from extraneous contact and potential tampering. (See, e.g., *People* v. *Tarm Poi* (1890) 86 Cal. 225, 231 [24 P. 998]; *People* v. *Bush* (1886) 68 Cal. 623, 627-628; *People* v. *Walther, supra,* 263 Cal.App.2d at pp. 322-323; *People* v. *Cahill* (1909) 11 Cal.App. 685, 689 [106 P. 115].)

At the same time, the broad discretion conferred by the statute authorizes the trial court to conduct the view as appropriate to the circumstances. For example, in *People* v. *Pompa, supra,* 192 Cal. 412, we rejected the defendant's claim of error that the view was not, as originally directed by the court, strictly limited to an inspection of the premises. (*Id.* at p. 421.) Although considerable testimony was taken and evidence received by the jury, "the record expressly disclose[d] that during the entire proceedings . . . the court in its completeness, including the judge, the clerk, the bailiff, the reporter, the interpreter, the jury, the defendant, and the respective counsel was at all times present, the only element absent being the walls and fittings of the courtroom wherein the court is usually convened." (*Id.* at p. 422.) Since "the forms of law governing the trial of causes" was otherwise observed, we declined to hold this "absence of formality" had compromised the proceedings. (*Ibid.*; see, e.g., *People* v. *Mayfield* (1997) 14 Cal.4th 668, 739 [60 Cal.Rptr.2d 1, 928 P.2d 485].)

In this case, Layman and Williamson investigated the crime scene; the trial court therefore reasonably designated them as "showers" to explain how

the actual physical conditions related to their trial testimony. The record establishes that their involvement was limited to that end, i.e., "showing" the jury what their words had described and the photographs had depicted. (See *People* v. *Milner, supra*, 122 Cal. at pp. 182-185; *People* v. *Walther, supra*, 263 Cal.App.2d at p. 323.) Given the court's broad discretion in these matters, we find no abuse in having the deputies respond to specific questions rather than proceeding in some other manner. (*People* v. *Walther, supra*, 263 Cal.App.2d at pp. 323-324.) Williamson's statement that the foliage differed in height from the time of the crime was also proper "to account for any change in [the] condition between [its] state as shown by the evidence and [its] appearance at the time the jury inspected [it]." (*People* v. *Cramley* (1913) 23 Cal.App. 340, 349 [138 P. 123].)

We also find no violation of defendant's constitutional rights by virtue of his absence during the view. Prior to the excursion, defendant expressly waived his presence and acknowledged he did so voluntarily. The record reflects that before making this decision he had discussed the matter with counsel. We have repeatedly rejected the argument that the Sixth Amendment confrontation clause of the United States Constitution or the due process clause of the California Constitution (art. I, § 15) prevents a criminal defendant from waiving the right of presence at a critical stage of a capital trial. (*People* v. *Mayfield, supra*, 14 Cal.4th at p. 738, and cases cited therein.) We have no reason to reconsider that conclusion, particularly when no additional testimony was taken in conjunction with the view. (Cf. *ibid.*)

We also find no prejudicial error with respect to defendant's statutory rights. In *People* v. *Jackson* (1996) 13 Cal.4th 1164, 1211 [56 Cal.Rptr.2d 49, 920 P.2d 1254], this court held "that a capital defendant may not voluntarily waive his right to be present during the proceedings listed in section 977, including those portions of the trial in which evidence is taken [before the trier of fact] . . . ." (See also § 1043.) Although a jury view is not among the designated proceedings in section 977, we have long held that "in so viewing the premises the jury was receiving evidence" even if nontestimonial. (*People* v. *Milner, supra*, 122 Cal. at p. 184.) Thus, it comes within the purview of section 977. Nevertheless, in this case it is not reasonably probable that a more favorable result would have been reached had defendant, in addition to his counsel, been present. (*People* v. *Mayfield, supra*, 14 Cal.4th at pp. 738-739.) On this record, we find "no sound basis to question the contemporaneous judgment of defense counsel, with which defendant then agreed, that defendant's trial interests would be better served by *not* attending the jury view." (*Id.* at p. 739.)

With respect to this latter point, we reiterate the "note of caution" sounded in *People* v. *Mayfield*: "Had the trial court obeyed the letter of the statutory

commands by refusing to accept defendant's waiver of presence, defendant might well have argued on appeal that requiring him to attend the jury view, thereby exposing the jurors to the strict security precautions that would be necessary in such a situation, had so prejudiced him before the jury as to deny him his constitutional rights to due process and a fair trial. We do not imply any view on the merits of such a contention, which is not now before us; we suggest only that trial courts should proceed with caution and that the Legislature may wish to reconsider the wisdom of statutory provisions that deprive capital defendants of the ability to waive their presence at trial proceedings outside the courtroom." (*People* v. *Mayfield, supra*, 14 Cal.4th at p. 739.)

### 4. *Instructional Issues*

#### a) *Consciousness of guilt*

The trial court instructed the jury in accordance with CALJIC No. 2.06 regarding any attempt to suppress evidence as circumstantial evidence of consciousness of guilt.[6] Defendant contends the instruction was unsupported by the evidence and improperly equated the conduct described with an admission or confession, especially when considered in conjunction with CALJIC No. 2.52, the "flight" instruction.[7]

At the time the court discussed jury instructions, defense counsel agreed the evidence supported CALJIC No. 2.06 and did not object to the court's proposed wording. Any claim of error is therefore waived. (*People* v. *Jackson, supra*, 13 Cal.4th at p. 1223.) Regardless, no error occurred. Sufficient evidence supported the instruction in light of Ramirez's testimony defendant attempted to make the murder scene "look like a bad dope deal" by breaking bottles, scattering loose marijuana, and shooting the body several more times with a rifle after the initial revolver shot. Defendant wiped his fingerprints off the handgun, put the weapon in Huffstuttler's hand, placed a knife near the body, and poured chili sauce around it. He then fled south before leaving the state for Chicago. Along the way he threw away some wires he had taken to disable Wilson's truck.

---

[6]As read by the trial court, CALJIC No. 2.06 (5th ed. 1988) provides: "If you find that a defendant attempted to suppress evidence against himself in any manner such as by destroying evidence or by concealing evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and its significance, if any, are matters for your consideration."

[7]As read by the trial court, CALJIC No. 2.52 (5th ed. 1988) provides: "The flight of a person immediately after the commission of a crime or after being accused of a crime is not sufficient in itself to establish guilt, but it is a fact which, if proved, may be considered by you in light of all the other proved facts in deciding the question of his guilt or his innocence. [¶] The weight to be given such a circumstance is entirely up to the jury."

CALJIC Nos. 2.06 and 2.52 do not impermissibly emphasize noncriminal activity as "consciousness of guilt." On the contrary, these instructions "made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior. The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations.]" (*People* v. *Jackson, supra*, 13 Cal.4th at p. 1224.) Moreover, section 1127c requires a flight instruction when the prosecution relies on such conduct as tending to show guilt.

■ As in past decisions, we find no merit in the contention the instructions improperly allow the jury to draw inferences about defendant's state of mind and equate evidence of suppression or concealment with a confession. "A reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than 'consciousness of having committed the specific offense charged.' The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto." (*People* v. *Crandell* (1988) 46 Cal.3d 833, 871 [251 Cal.Rptr. 227, 760 P.2d 423].) For cognate reasons they do not violate the proscription of *Griffin* v. *California* (1965) 380 U.S. 609, 615 [85 S.Ct. 1229, 1233, 14 L.Ed.2d 106] against referring to the defendant's exercise of his Fifth Amendment right not to testify as evidence of guilt. The instructions in no respect implicated defendant's failure to testify or directed the jury to draw negative inferences from it.

b) *Special circumstance*

■ With respect to the special circumstance allegation, the trial court instructed in accordance with CALJIC No. 8.80 (5th ed. 1988) in part as follows: "The People have the burden of proving the truth of that special circumstance. [¶] If you have a reasonable doubt as to whether or not a special circumstance is true, then you must find it to be not true." Defendant contends the court erroneously failed to define "reasonable doubt" in this context or to direct the jury to find the special circumstance "beyond a reasonable doubt."

The instruction correctly states the law, and defendant did not request clarification or amplification. He has therefore waived the issue on appeal. (*People* v. *Arias* (1996) 13 Cal.4th 92, 171 [51 Cal.Rptr.2d 770, 913 P.2d 980]; see *People* v. *Byrnes* (1866) 30 Cal. 206, 208 [general instruction sufficient "particularly . . . where the accused does not request that the charge may be made more specific or minute"].)

Moreover, the claim is meritless. Shortly before giving the special circumstance instruction, the court had already charged the jury that the defendant is presumed innocent and that the prosecution has the burden of proving guilt beyond a reasonable doubt. It then delineated the applicable standard: "Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge."

"It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [Citations.] '[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial.' [Citation.] 'The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' [Citation.]" (*People* v. *Burgener* (1986) 41 Cal.3d 505, 538-539 [224 Cal.Rptr. 112, 714 P.2d 1251].) In *Burgener*, the court had not defined reasonable doubt in conjunction with the instruction on express malice but had given the definition elsewhere. (*Ibid.*) Hence, the instruction was not defective. "Given the entirety of the charge to the jury, it is clear that there is no reasonable possibility that the jury could have been misled as to the appropriate standard for their special finding on express malice. The instructions taken as a whole indicate that the prosecution's burden of proof throughout was proof beyond a reasonable doubt." (*Id.* at p. 540.) We reach a similar conclusion on this record.

c) *Mental state for lesser included offenses*

Without much elaboration, defendant contends the instructions on the mental states necessary to prove the lesser included offenses of second degree murder and voluntary manslaughter "were more likely to have

confused the jury and caused the jury to assume that [defendant's] mental state was the crux" of these offenses.[8] Contrary to defendant's premise, the perpetrator's mental state is precisely the "crux" of the distinction between first and second degree murder and between murder and manslaughter. (See §§ 187, 188, 189, 192; see generally, 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) §§ 452-455, pp. 508-513; *id.*, §§ 487-489, pp. 549-553; *id.*, §§ 511-517, pp. 577-585.) The instructions correctly stated the law and were not likely to confuse the jury when considered in context and in relation to each other. (*People* v. *Burgener, supra,* 41 Cal.3d at pp. 538-540.) Since defendant did not request clarification or amplification, further consideration on appeal has been waived. (*People* v. *Arias, supra,* 13 Cal.4th at p. 171; *People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1192 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

 Moreover, any alleged ambiguity in the second degree murder and voluntary manslaughter instructions could not have prejudiced defendant when the jury found him guilty of first degree murder.

---

[8]Defendant cites the following instructions as allegedly confusing:

A modified version of CALJIC No. 3.31.5 (5th ed. 1988): "In each of the crimes charged in Counts 1 and 2 and in the lesser and included crimes of second-degree murder and voluntary manslaughter as to Counts 1 and 2, there must exist a certain mental state in the mind of the perpetrator, and unless that mental state exists, the crime to which it relates is not committed. [¶] The mental state required or the mental states required are included in the definition of the crimes charged, which I will read you later."

CALJIC No. 8.30 (5th ed. 1988): "Murder in the second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being, but the evidence is insufficient to establish deliberation and premeditation."

A modified version of CALJIC No. 8.40 (1989 rev.): "Every person who unlawfully kills another human being without malice aforethought but with an intent to kill, is guilty of voluntary manslaughter in violation of Section 192(a) of the Penal Code. [¶] There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion or in the honest but unreasonable belief in the necessity to defend one's self against imminent peril to life or great bodily injury. [¶] In order to prove [such] crime, each of the following elements must be proved: One, that a human being was killed. Two, that the killing was unlawful, and, three, the killing was [done] with the intent to kill."

CALJIC No. 8.43 (5th ed. 1988): "To reduce the killing upon sudden quarrel or heat of passion from murder to manslaughter, a killing must have occurred while the slayer was acting under the direct[] and immediate influence of that quarrel or heat of passion. [¶] When the influence of sudden quarrel or heat of passion has ceased to obscure the mind of the accused and sufficient time has elapsed for anger or passion to end and [for] reason to control his conduct, it will no longer reduce an intentional killing to manslaughter. [¶] The question as to whether the cooling period has elapsed and reason has returned is not measured by the standard of the accused but the duration of the cooling period is the time it would take the average or ordinarily reasonable person to have cooled such passion and for that person's reason to have returned."

d) *Reasonable doubt*

As previously explained, the trial court instructed the jury in accordance with CALJIC No. 2.90, defining reasonable doubt as the state of the evidence which "leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge." (See *ante*, at p. 328.) Defendant now contends this definition violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the federal Constitution because the reference to "moral certainty" allowed the jurors to determine guilt based on their own subjective evaluation of defendant's conduct. As with prior similar challenges, we find no fault with this instruction. "We have repeatedly upheld the efficacy of this instruction, and defendant cites no persuasive reason to revisit this conclusion." (*People* v. *Bradford* (1997) 14 Cal.4th 1005, 1054 [60 Cal.Rptr.2d 225, 929 P.2d 544]; see *Victor* v. *Nebraska* (1994) 511 U.S. 1, 6 [114 S.Ct. 1239, 1243, 127 L.Ed.2d 583].)

5. *Verdict Form for Prior Felony Conviction Allegation*

The trial court bifurcated proceedings on the truth of the allegation that defendant had previously been convicted of attempted voluntary manslaughter and deferred consideration pending the jury's determination of guilt on the substantive charges. Following the submission of evidence on the prior allegation, the jury received a verdict form on which to record their finding, which read: "We, the Jury, empaneled to try the above-entitled cause, find it to be true that the defendant Paul Clarence Bolin previously has been convicted of a violation of 664/192.1 of the Penal Code, within the [meaning] of Penal Code Section 667."[9] The form also contained an alternate version for a "not true" finding.[10] Defendant now maintains the verdict was defective due to the "unintelligible" reference to section "192.1," which assertedly is not a valid statute. He further contends this defect rendered the subsequent penalty verdict unreliable.

We find no objection of record to the form of the verdict either at the time the court proposed to submit it or when the jury returned its finding. The issue is therefore waived. (*People* v. *Webster* (1991) 54 Cal.3d 411, 446 [285 Cal.Rptr. 31, 814 P.2d 1273].) We also find no prejudicial defect. Defendant

---

[9]Defendant mischaracterizes the form as a "special verdict." Special verdicts are utilized for the jury to make specific factual findings rather than return a general verdict of "guilty" or "not guilty." (See § 1150 et seq.) Although it subsumes factual matters, a finding on the truth of an enhancement allegation is an ultimate determination of the legal question presented, making it tantamount to a general verdict.

[10]Although the "true" version omitted the word "meaning," the "not true" version directly underneath contained it. The jury thus could not have been confused by the omission.

was convicted of attempted voluntary manslaughter in 1983. At that time, nonvehicular voluntary manslaughter was set forth in section 192, subdivision 1, also referred to as section "192.1," as in the abstract of judgment for defendant's prior conviction. (See Stats. 1945, ch. 1006, § 1, p. 1942; see also Stats. 1984, ch. 742, § 1, p. 2703 [amending section 192 to designate former subdivision 1 as subdivision (a)].) Any variance in the wording was thus technical at worst. ■ "[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. [Citations.]" (*People* v. *Webster, supra,* 54 Cal.3d at p. 447, fn. omitted; see §§ 1258, 1404.) The jury returned a "true" finding based on the testimony and documentary evidence presented at the proceeding, all of which was predicated on the allegation defendant had been convicted under former section 192, subdivision 1. Accordingly, we discern no possibility of prejudice.

### 6. *Sufficiency of the Evidence of First Degree Murder*

■ Defendant contends the evidence of first degree murder was insufficient to establish a preconceived design or careful thought or reflection. (See, e.g., *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].) In particular, he argues that he could not have formed the requisite state of mind because the unexpected arrival of Mincy and Wilson immediately precipitated both the argument with Huffstuttler about the strangers' observations of the marijuana plants and the shootings.

■ In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *Jackson* v. *Virginia* (1979) 443 U.S. 307, 319-320 [99 S.Ct. 2781, 2789-2790, 61 L.Ed.2d 560].) Reversal on this ground is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) **(26)** In *People* v. *Anderson, supra,* 70 Cal.2d at pages 26-27, we identified three categories of evidence relevant to resolving the issue of premeditation and deliberation: planning activity, motive, and manner of killing. However, as later explained in *People* v. *Pride* (1992) 3 Cal.4th 195, 247 [10 Cal.Rptr.2d 636, 833 P.2d 643]: "*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended

to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]" Thus, while premeditation and deliberation must result from " 'careful thought and weighing of considerations' " (70 Cal.2d at p. 27), we continue to apply the principle that "[t]he process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" (*People* v. *Mayfield, supra,* 14 Cal.4th at p. 767.)

Defendant correctly notes the killings took place within a few minutes of the victims' arrival at his cabin. What occurred within those few minutes, however, is particularly telling with respect to his state of mind. According to both Wilson and Eloy Ramirez, defendant began arguing with Huffstuttler when Mincy and Wilson were shown the marijuana plants. Defendant continued berating Huffstuttler as the two walked back toward the cabin. Defendant went inside, retrieved a revolver, and shot Huffstuttler at close range. He proceeded back across the creek and confronted Wilson and Mincy. After apologizing that he had "nothing against" them, he opened fire. As a wounded Wilson fled the scene, he heard Mincy plead for his life. More shots were fired. Defendant returned to Huffstuttler and fired several rifle rounds into his motionless body. The autopsy report indicated at least three shots were inflicted before he died, although according to Ramirez he did not move after the first shot. After the shootings, defendant told Ramirez he was going to make the scene look like a bad dope deal had occurred and scattered marijuana, broke bottles, and poured chili sauce around Huffstuttler's body. None of the victims were armed; nor did they engage in any provocative conduct.

From this evidence, a reasonable trier of fact could infer defendant had a motive for the killings, both to punish Huffstuttler for revealing the marijuana operation to strangers and to protect his crop from theft or exposure to law enforcement. He also may have wanted to eliminate Mincy and Wilson as witnesses to the Huffstuttler shooting. In conjunction with these possible motives, the manner of killing supports a finding of premeditation and deliberation. Both victims died of multiple gunshot wounds, several of which would have been fatal individually. While defendant fired some shots at Mincy as he was attempting to flee, at least one shot entered his body as he lay in a fetal position. This forensic evidence indicates defendant did not want merely to wound either victim; he wanted to make certain they died. The trial testimony also suggests rapid but purposeful planning activity once defendant realized the potential consequences of his partner's carelessness.

While chastising Huffstuttler, he walked back to the cabin where he got a gun. Rather than seek a reconciliation, he shot Huffstuttler without warning. He then shot Mincy and Wilson and made good his escape after attempting to conceal his own involvement in the crimes. Viewing the record in its entirety, we find sufficient evidence to support the jury's finding of first degree murder. (See *People* v. *Anderson, supra,* 70 Cal.2d at p. 27.) Defendant's argument simply asks this court to reweigh the facts.

### 7. *Ineffective Assistance of Counsel Claims*

██ Defendant alleges numerous instances of ineffective assistance of counsel. To prevail on such claims, he must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216, 217 [233 Cal.Rptr. 404, 729 P.2d 839].) Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 690 [104 S.Ct. at p. 2066].) To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." (*People* v. *Pope, supra,* 23 Cal.3d at p. 426, fn. omitted.) Finally, prejudice must be affirmatively proved; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [104 S.Ct. at p. 2068]; *People* v. *Ledesma, supra,* 43 Cal.3d at pp. 217-218.)

### a) *Inadequate investigation and review of discovery*

Defendant contends counsel's investigation and review of discovery were inadequate because he failed to interview Patricia Islas or to anticipate her testimony about statements made by Ramirez. At trial, counsel made a hearsay objection to this testimony and also complained the statements had not been disclosed on discovery. In response, the prosecutor noted they were contained in a police report. On that basis, defendant asserts counsel's review and preparation must have been deficient. The record reflects, however, that the "discovery" objection was predicated on a lack of detail in the report regarding Ramirez's statements, implying counsel had in fact reviewed what was provided. The record also suggests a defense investigator contacted Islas prior to trial. More importantly, even if he did not, defendant fails to establish additional investigation would have produced exculpatory or impeachment evidence.

### b) *Use of inadequate investigator*

Without elaboration, defendant asserts the investigator employed on his case must have been inadequate because counsel's performance was so deficient, also noting the investigator admitted stealing money from defendant. These assertions are entirely too vague and conclusory to demonstrate any lack of competence on the part of either. Absent such a demonstration, we will not speculate defendant received ineffective assistance.

### c) *Failure to utilize expert witnesses*

Defendant faults counsel's lack of "attack" in cross-examining the prosecution's expert witnesses and the failure to call defense experts to counter the ballistics and blood-spatter evidence presented by the prosecution. ▮▮▮▮ "As to whether certain witnesses should have been more rigorously cross-examined, such matters are normally left to counsel's discretion and rarely implicate inadequacy of representation. [Citations.] Defendant identifies no exculpatory or impeachment evidence that counsel could have revealed by further questioning of prosecution witnesses [or examination of defense experts] and that would have produced a more favorable result at trial. [¶] . . . Such claims must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused. [Citations.] We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation." (*People* v. *Cox, supra,* 53 Cal.3d at p. 662, fn. omitted; *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1059 [5 Cal.Rptr.2d 230, 824 P.2d 1277].) Whether to call certain witnesses is also a matter of trial tactics, unless the decision results from unreasonable failure to investigate. (*People* v. *Mitcham, supra,* 1 Cal.4th at p. 1059.) The record does not establish defense experts would have provided exculpatory evidence if called, and we decline to speculate in that regard as well.

### d) *Admission of defendant's guilt in closing argument*

▮▮▮▮ Defendant asserts defense counsel was ineffective for acknowledging some culpability on defendant's part in closing argument: "There is no doubt that the events that happened on Labor Day weekend with my client has some liability for [*sic*], some responsibility for. We are not going to say not guilty on all counts. That is just not what happened."

We find no incompetence in these remarks. Given the overwhelming evidence of defendant's guilt, including the testimony of two eyewitnesses, the concession appears to be a reasonable trial tactic by which counsel could

urge the jury to return verdicts on the lesser included offenses of second degree murder or voluntary manslaughter. Since counsel could also reasonably anticipate having to conduct a penalty phase, it also allowed him to preserve his credibility in arguing mitigation. (See, e.g., *People* v. *Cox*, *supra*, 53 Cal.3d at p. 661.) In resolving these claims, "we must 'assess counsel's overall performance throughout the case' [citation], evaluating it 'from counsel's perspective at the time of the alleged error and in light of all the circumstances. [Citation.]' [Citation.]" (*Ibid.*) Moreover, when read in context, the argument in no respect reflects a breakdown of the adversarial process. (See, e.g., *In re Visciotti* (1996) 14 Cal.4th 325, 362-366 [58 Cal.Rptr.2d 801, 926 P.2d 987] (dis. opn. of Brown, J.).) Counsel noted discrepancies between the testimony of Wilson and Ramirez, suggested the jury could infer Ramirez was more involved in the crimes than claimed, and pointed to other evidence defendant was guilty of less than first degree murder. The multiple-murder special circumstance would be triggered even if the jury found only one of the killings was first degree murder (§ 190.2, subd. (a)(3)); therefore, counsel reasonably focused his guilt phase argument on reducing that possibility. Conceding some measure of culpability was a valid tactical choice under these restrictive circumstances.

### 8. *Cumulative Effect of Error*

Finally, defendant contends that even if harmless individually, the cumulative effect of the trial errors mandates reversal. Because we have rejected all of his claims, we perforce reject this contention as well.

### C. *Penalty Phase Issues*

### 1. *Consideration of Prior Unadjudicated Criminal Acts*

Defendant makes several claims regarding the jury's consideration of unadjudicated criminal activity as a circumstance in aggravation. (§ 190.3, factor (b).) He acknowledges this court has previously upheld the use of such evidence at the penalty phase. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480].) He argues, however, that he was denied his constitutional right to an impartial fact finder and reliable penalty determination because the same jury that decided his guilt could not be expected to evaluate this evidence without bias or prejudice. We have considered and rejected this argument in *People* v. *Balderas*, *supra*, 41 Cal.3d at pages 204-205, and find no reason to reconsider our conclusions. We have also previously determined that the use of factor (b) evidence does not run afoul of the statute of limitations. (*People* v. *Jennings* (1988) 46 Cal.3d 963, 981-982 [251 Cal.Rptr. 278, 760 P.2d 475].) Nor was the jury

required unanimously to agree defendant committed the alleged crimes. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127].)

On this record, we find no error by virtue of the trial court's failure to repeat the "presumption of innocence" instruction given prior to guilt phase deliberations. At the beginning of the penalty phase, the court expressly alerted the jury that "[m]ost of the rules that I gave you before . . . will apply to this case." Nothing in the court's subsequent penalty instructions suggested the jury should disregard the earlier admonition that a criminal defendant is presumed innocent; and a reasonable juror would assume it continued to apply. (*People* v. *Sanders* (1995) 11 Cal.4th 475, 561 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

### 2. *Admission of Threatening Letter*

Over defense objection, the trial court admitted evidence of a threatening letter defendant sent to Jerry Halfacre while in jail awaiting trial.[11] Defendant renews his claims that the prosecution failed to give proper notice under section 190.3 and that the evidence did not constitute criminal activity.

With respect to notice, the record discloses that the trial began on December 3, 1990. On November 1, at the time of the change of venue motion, the

---

[11]The letter read as follows:

"Jerry 6/25/90

"Well I finally heard from Paula [defendant's daughter and mother of Halfacre's child] and what I heard from her I'm not to[o] pleased with. I heard her side of things w[h]ich are real different from what you had to say. I'm only going to say this one time so you better make sure you understand. If you ever[] touch my daughter again, I'll have you permanently removed from the face of this Earth. You better thank your lucky stars you['re] Ashley's father or you[']d already have your fucking legs broke.

"I found out what happen[e]d to most of the money from the van, and I also found out you got 1500 for the truck not 1300 like you said. I'm still going to find out how much you got for the Buick and if it's 1¢ over 1000 you can kiss your ass good by[e]. I also found out it was running like a top and the burnt valves was a bunch of bull shit, just like I thought in the first place. You sounded a little shak[]y over the phone and gave yourself away.

"I told you a long time ago don't play fucking games with me. You're playing with the wrong person asshole. I've made a couple of phone calls to San Pedro to some friends of mine and the[y're] not to[o] happy with your fucking game playing with other people's money and especially you hitting Paula.

"What I want done and it better be done. Everything that's mine or hers tools, clothes, books, gun, TV, VCR, I don't fucking care if it's a bobby pin, you better give it to Paula. I want all my shit given to her and I mean every fucking thing. You have a week to do it or I make another phone call. I hope you get the fucking message. Your game playing is eventually going to get you in more than a poo butt game player can handle.

"1 week asshole.

"And keep playing your game with [my granddaughter] and see what happens."

court reviewed various other matters including the notice of circumstances in aggravation, one being the threatening letter, which the prosecution had received approximately two weeks earlier. A prior written motion, served October 22, requesting an order for a handwriting exemplar from defendant, indicated the letter was "an important part of the case." At the November 1 hearing, defense counsel acknowledged the prosecutor had informed him of her intention to use the letter in aggravation and expressly disavowed any objection as to form or timeliness of the notice. Nor did he request a continuance to prepare a response to the evidence. In light of these circumstances, any further challenge to the sufficiency of the notice or alleged prejudice is precluded. (*People* v. *Medina* (1995) 11 Cal.4th 694, 771 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

With respect to the substantive claim, section 422 makes it a crime to "willfully threaten[] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety . . . ." Relying on *People* v. *Brown* (1993) 20 Cal.App.4th 1251 [25 Cal.Rptr.2d 76], defendant contends that because the letter did not contain an unconditional threat, it did not constitute a violation of section 422 as a matter of law and was therefore inadmissible as evidence of prior unadjudicated criminal activity. In his reply brief, he further argues that even if section 422 does not mandate an unconditional threat (see, e.g., *People* v. *Stanfield* (1995) 32 Cal.App.4th 1152 [38 Cal.Rptr.2d 328]), the letter was still insufficient on its face to come within the statutory proscription.

In *People* v. *Brown*, the defendant accosted two women approaching their apartment and made several menacing statements as he pointed a gun at the head of one of the women. (20 Cal.App.4th at p. 1253.) When the other said they should call the police, the defendant said he would kill them if they did. (*Ibid.*) A jury found him guilty of violating section 422. The Court of Appeal reversed the judgment, construing the statute to preclude conviction when the threat is conditional in any respect. "The plain meaning of an 'unconditional' threat is that there be no conditions. '*If* you call the police . . .' *is* a condition. [¶] To—by some linguistic legerdemain—construe 'unconditional threat' to include a 'conditional threat' would only create 'serious constitutional problems.' (*People* v. *Mirmirani* . . . (1981) 30 Cal.3d 375, 382 . . . .)" (*People* v. *Brown, supra,* 20 Cal.App.4th at p. 1256.)

Since *Brown*, several Court of Appeal decisions have expressly disagreed with this strict interpretation of section 422. (*People* v. *Dias* (1997) 52 Cal.App.4th 46 [60 Cal.Rptr.2d 443]; *People* v. *Stanfield*, *supra*, 32 Cal.App.4th 1152; *People* v. *Brooks* (1994) 26 Cal.App.4th 142 [31 Cal.Rptr.2d 283]; see also *People* v. *Gudger* (1994) 29 Cal.App.4th 310 [34 Cal.Rptr.2d 510] [construing section 76, prohibiting threats against a judge].) ▋ We find the reasoning of these subsequent cases more persuasive and now hold that prosecution under section 422 does not require an unconditional threat of death or great bodily injury.[12]

In reaching this conclusion, we begin with the original source of the statutory language. In 1981, this court invalidated former section 422 as unconstitutionally vague. (*People* v. *Mirmirani* (1981) 30 Cal.3d 375, 388 [178 Cal.Rptr. 792, 636 P.2d 1130].) The Legislature subsequently repealed the statute and enacted a substantially revised version in 1988, adopting almost verbatim language from *United States* v. *Kelner* (2d Cir. 1976) 534 F.2d 1020. (See Stats. 1987, ch. 828, § 28, p. 2587; Stats. 1988, ch. 1256, § 4, pp. 4184-4185.) In *Kelner*, the defendant, a member of the Jewish Defense League, had been convicted under a federal statute for threatening to assassinate Palestinian leader Yasser Arafat, who was to be in New York for a meeting at the United Nations. Kelner argued that without proof he specifically intended to carry out the threat, his statement was political hyperbole protected by the First Amendment rather than a punishable true threat. (*United States* v. *Kelner*, *supra*, 534 F.2d at p. 1025.)

The reviewing court disagreed and concluded threats are punishable consonant with constitutional protections "when the following criteria are satisfied. So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, the statute may properly be applied." (*United States* v. *Kelner*, *supra*, 534 F.2d at p. 1027.) In formulating this rationale, the *Kelner* court drew on the analysis in *Watts* v. *United States* (1969) 394 U.S. 705 [89 S.Ct. 1399, 22 L.Ed.2d 664], in which the United States Supreme Court reversed a conviction for threatening the President of the United States. Defendant Watts had stated, in a small discussion group during a political rally, " 'And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.' " (*Id.* at p. 706 [89 S.Ct. at p. 1401].) Both Watts and the crowd laughed after the statement was made. (*Id.* at p. 707 [89 S.Ct. at p. 1401].) The Supreme Court determined that taken in context, and considering the conditional nature of

---

[12]Contrary language in *People* v. *Brown*, *supra*, 20 Cal.App.4th 1251, is disapproved.

the threat and the reaction of the listeners, the only possible conclusion was that the statement was not a punishable true threat, but political hyperbole privileged under the First Amendment. (*Id.* at pp. 707-708 [89 S.Ct. at pp. 1401-1402].)

As the *Kelner* court understood this analysis, the Supreme Court was not adopting a bright line test based on the use of conditional language but simply illustrating the general principle that punishable true threats must express an intention of being carried out. (See *United States* v. *Kelner, supra,* 534 F.2d at p. 1026.) "In effect, the Court was stating that threats punishable consistently with the First Amendment were only those which according to their language and context conveyed a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected [attacks on government and political officials]." (*Ibid.*) Accordingly, "[t]he purpose and effect of the *Watts* constitutionally-limited definition of the term 'threat' is to insure that only unequivocal, unconditional and specific expressions of intention immediately to inflict injury may be punished—only such threats, in short, as are of the same nature as those threats which are . . . 'properly punished every day under statutes prohibiting extortion, blackmail and assault . . . .' " (*Id.* at p. 1027.)

Given the rationale of *Kelner* and *Watts,* it becomes clear the reference to an "unconditional" threat in section 422 is not absolute. As the court in *People* v. *Stanfield* noted, "By definition, extortion punishes conditional threats, specifically those in which the victim complies with the mandated condition. [Citations.] Likewise, many threats involved in assault cases are conditional. A conditional threat can be punished as an assault, when the condition imposed must be performed immediately, the defendant has no right to impose the condition, the intent is to immediately enforce performance by violence and defendant places himself in a position to do so and proceeds as far as is then necessary. [Citation.] It is clear, then, that the *Kelner* court's use of the word 'unconditional' was not meant to prohibit prosecution of all threats involving an 'if' clause, but only to prohibit prosecution based on threats whose conditions precluded them from conveying a gravity of purpose and imminent prospect of execution." (*People* v. *Stanfield, supra,* 32 Cal.App.4th at p. 1161; *People* v. *Brooks, supra,* 26 Cal.App.4th at pp. 145-146; see also *In re M.S.* (1995) 10 Cal.4th 698, 714 [42 Cal.Rptr.2d 355, 896 P.2d 1365].) As the court commented in *U.S.* v. *Schneider* (7th Cir. 1990) 910 F.2d 1569, 1570: "Most threats are conditional; they are designed to accomplish something; the threatener hopes that they *will* accomplish it, so that he won't have to carry out the threats."

Moreover, imposing an "unconditional" requirement ignores the statutory qualification that the threat must be "*so* . . . unconditional . . . *as to convey*

*to the person threatened, a gravity of purpose and an immediate prospect of execution . . . .*" (§ 422, italics added.) "The use of the word 'so' indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim." (*People* v. *Stanfield, supra,* 32 Cal.App.4th at p. 1157.) "If the fact that a threat is conditioned on something occurring renders it not a true threat, there would have been no need to include in the statement the word 'so.' " (*People* v. *Brooks, supra,* 26 Cal.App.4th at p. 149.) This provision "implies that there are different degrees of unconditionality. A threat which may appear conditional on its face can be unconditional under the circumstances. . . . [¶] Language creating an apparent condition cannot save the threatener from conviction when the condition is illusory, given the reality of the circumstances surrounding the threat. A seemingly conditional threat contingent on an act highly likely to occur may convey to the victim a gravity of purpose and immediate prospect of execution." (*People* v. *Stanfield, supra,* 32 Cal.App.4th at p. 1158.) Accordingly, we reject defendant's threshold contention that the letter was inadmissible because it contained only conditional threats.

 Alternatively, defendant argues that the letter still does not meet the statutory definition because the threat lacked immediacy and Halfacre did not testify he feared for his safety. We need not definitively resolve these contentions.[13] Even if the trial court should have excluded the letter, we find no reasonable possibility the error affected the verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135].) Although some of the language in the letter is menacing, it also reflects defendant's concern for his daughter's and granddaughter's well-being, a point stressed by the defense in mitigation. Moreover, the nature and circumstances of the threats would not necessarily provoke serious concern, especially considering defendant was incarcerated and would at the least have to make outside arrangements to effect them. Halfacre waited four months before giving the letter to his probation officer, during which time apparently nothing had happened.

---

[13]Resolution of defendant's contentions on the merits is somewhat problematic because the court did not properly instruct that the threat must "on its face and under the circumstances in which it is made, [be] so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat . . . ." (See CALJIC No. 9.94 (6th ed. 1996).) Thus, it is unclear from the record whether the jurors understood they must determine whether, evaluated in context, the threats conveyed sufficient immediacy as well as "gravity of purpose and likelihood of execution" (*United States* v. *Kelner, supra,* 534 F.2d at p. 1026) to be criminal, and hence a circumstance in aggravation. Nevertheless, any instructional error is immaterial given our finding that admission of the letter did not prejudice defendant.

More importantly, the letter paled compared to other aggravating evidence, which the prosecutor focused on in closing argument. In particular, the guilt phase testimony revealed defendant as a calculating and callous individual, willing to kill defenseless victims, including his friend and partner Huffstuttler, in cold blood to protect his drug enterprise. In addition, the assault with great bodily injury against Matthew Spencer and attempted manslaughter against Kenneth Ross confirmed defendant's pattern of resorting to violence in dealing with problems. Given this history, it is unlikely the jury accorded the letter much, if any, weight in fixing the penalty at death.

### 3. Instructional Claims

#### a) Lack of unanimous finding as to other criminal activity

Defendant claims instructional error for failure to require that the jury render a unanimous finding as to prior criminal activity. We have long held the Constitution does not mandate such a finding (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113]), and find no reason to reconsider this conclusion. Defendant further argues that because he had been previously convicted of only one felony, attempted voluntary manslaughter, the instruction on unadjudicated criminal activity unduly emphasized this evidence as an aggravating factor. We are unpersuaded the jury was likely to interpret the court's direction in this manner.

#### b) Instructing on aggravating and mitigating factors as a "unitary" list

Defendant asserts the trial court violated various constitutional rights by failing to delineate which statutory factors were aggravating and which were mitigating. We have consistently rejected this argument. "[T]he aggravating or mitigating nature of [the section 190.3] factors should be self-evident to any reasonable person within the context of each particular case." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 316 [168 Cal.Rptr. 603, 618 P.2d 149].) Here, the court explained that an aggravating factor was anything connected with the crime "which increases its guilt or enormity or adds to the injurious consequences . . . ." By contrast, a mitigating factor was any "extenuating circumstance" short of justification or excuse. Nothing in these commonly understood definitions supports defendant's assertions that the jury could have considered section 190.3, factor (d) (extreme mental or emotional disturbance), factor (g) (acting under the substantial domination of another), or factor (h) (impairment due to mental defect or intoxication) as aggravating, particularly since there was no evidence of such circumstances. Moreover, in closing argument both the prosecutor and defense counsel identified which factors could be considered aggravating and which mitigating.

We are also unpersuaded that language instructing the jury to determine "whether or not" section 190.3, factors (d) through (h) and (j) existed caused any confusion in this regard. (*People* v. *Carpenter* (1997) 15 Cal.4th 312, 420 [63 Cal.Rptr.2d 1, 935 P.2d 708].) This reference simply complemented the court's generic instruction that the jury's function was to "decide what the facts are from the evidence received in the trial . . . ." Furthermore, in the final analysis "the constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing 'scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute.' [Citation.]" (*California* v. *Ramos* (1983) 463 U.S. 992, 1009, fn. 22 [103 S.Ct. 3446, 3457, 77 L.Ed.2d 1171].)

c) *Failure to reinstruct on reasonable doubt*

During penalty phase instruction, the trial court did not repeat the definition of reasonable doubt given at the guilt phase. Defendant contends this omission violated various constitutional rights because the term is not commonly understood outside the law. We find no error. At the beginning of the penalty phase, the court expressly alerted the jury that "[m]ost of the rules that I gave you before . . . will apply to this case." Nothing in the court's subsequent instructions suggested the jury should disregard the earlier definition; a reasonable juror would assume it continued to apply. (*People* v. *Sanders*, *supra*, 11 Cal.4th at p. 561.)

d) *Vague and ambiguous standard for imposing death sentence*

In explaining the nature of the penalty phase deliberative process, the trial court instructed: "To return a judgment of death, each of you must be persuaded that the aggravating factors are so substantial in comparison with the mitigating factors, that it warrants death instead of life without parole." Defendant now argues the "so substantial" and "warrants" phrasing is impermissibly vague and does not adequately guide the decision to impose death. As in the past, we find no constitutional infirmity. (See, e.g., *People* v. *Breaux* (1991) 1 Cal.4th 281, 315-316 [3 Cal.Rptr.2d 81, 821 P.2d 585].) Prior to this instruction, the court explained, "In the weighing of aggravating and mitigating circumstances, it does not mean a mere mechanical counting of the factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. [¶] In weighing the various circumstances, you determine under the relevant evidence which penalty is justified

and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." Assessed in this context, the "so substantial" instruction "clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty. [Citations.]" (*People* v. *Arias, supra,* 13 Cal.4th at p. 171.)

We also find the instructions considered as a whole sufficient to guide the jury's deliberative process and inform the jurors they must find death is the "appropriate" penalty if that is their verdict.

### e) *Refusal of defendant's instruction No. 9*

Defendant contends the trial court erroneously refused to give the following instruction proffered by the defense: "Each mitigating factor is important because any single mitigating factor may, standing alone, support a decision that death is not the appropriate penalty."[14] In *People* v. *Breaux, supra,* 1 Cal.4th at pages 316-317, we rejected essentially the same claim for two reasons. First, the court did not give the "unadorned" *Brown* instruction (*People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440]), which might mislead the jury as to the scope of its sentencing discretion and responsibility. (*People* v. *Breaux, supra,* 1 Cal.4th at p. 317; see *People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) Second, the instructions adequately performed the constitutional function of guiding the jury's discretion in sentencing. (*People* v. *Breaux, supra,* 1 Cal.4th at p. 317.) In this case, the court gave similar instructions that told the jury "it could return a death verdict only if aggravating circumstances predominated and death is the appropriate verdict." (*Id.* at p. 316, fn. omitted; see *ante,* at p. 342.) Defendant submits no persuasive reason for reconsidering this rationale.

### f) *Refusal to instruct on sympathy*

Defendant contends the trial court erroneously refused instructions informing the jurors in various terms that sympathy, pity, compassion, and mercy were factors in deciding the appropriate sentence. We find no error.

---

[14]The record does not confirm this wording. The proffered instruction actually read: "The mitigating circumstances that I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence in this case. [¶] But you should not limit your consideration of mitigating circumstances to these specific factors. You also may consider any other circumstances relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty. [¶] *Any one of the mitigating factors, standing alone, may support a decision that death is not the appropriate punishment in this case.*" (Italics added.)

"We have repeatedly held that a jury told it may sympathetically consider all mitigating evidence need not also be expressly instructed it may exercise 'mercy.' [Citations.]" (*People* v. *Stanley* (1995) 10 Cal.4th 764, 840 [42 Cal.Rptr.2d 543, 897 P.2d 481]; see also *People* v. *Clark* (1992) 3 Cal.4th 41, 163-164 [10 Cal.Rptr.2d 554, 833 P.2d 561].) Here, the trial court gave the standard instruction to take into account "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." The court also told the jury "to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." No additional instruction was required.[15]

g) *Lack of instruction on relative weight of aggravation and mitigation*

Defendant faults the trial court for failing to instruct the jury that a life sentence was mandatory if they did not find the aggravating circumstances outweighed those in mitigation and that they could return a judgment of life in prison even if they found to the contrary. We have previously addressed and rejected both arguments in light of the standard instructional language. As explained in *People* v. *Duncan* (1991) 53 Cal.3d 955, 978 [281 Cal.Rptr. 273, 810 P.2d 131], with respect to the first point, "We do not think that there is a reasonable likelihood that any of the jurors would have concluded that, even if the mitigating factors outweighed those in aggravation, the 'so substantial in comparison with' language nevertheless might demand imposition of the higher punishment. [Citation.] The instruction clearly stated that the death penalty could be imposed only if the jury found that the aggravating circumstances outweighed mitigating. There was no need to additionally advise the jury of the converse . . . ."

With respect to the second point, we noted that unlike other sentencing schemes creating a presumption in favor of death, "our statute and instruction give the jury broad discretion to decide the appropriate penalty by weighing all the relevant evidence. The jury may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death." (*People* v. *Duncan*, *supra*, 53 Cal.3d at p. 979; cf. *Blystone* v. *Pennsylvania* (1990) 494 U.S. 299 [110 S.Ct. 1078,

---

[15]Since the trial court directed the jury to disregard any inapplicable guilt phase instructions, we find it unlikely the earlier admonishment not to consider sympathy or pity misled their deliberations.

108 L.Ed.2d 255] [concluding the Pennsylvania death penalty statute satisfied the requirements of the Eighth Amendment even though it mandated a death sentence upon the jury's finding one aggravating circumstance and no mitigating circumstances].) We decline to reconsider this determination.

### 4. *Ineffective Assistance of Counsel*

Although several family members and friends presented mitigating testimony as to· his background and character, defendant contends his counsel rendered ineffective assistance at the penalty phase in failing to submit additional evidence regarding his childhood, including alleged abuse, his mental health, his military service and injuries, and his employment history. We find none of this evidence of record. Accordingly, "without engaging in speculation, we cannot infer anything about its existence, availability, or probative force, or the probable consequences of its use at trial." (*People* v. *Wrest* (1992) 3 Cal.4th 1088, 1116 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) Defendant has thus failed to establish either incompetence or prejudice. (*People* v. *Pope, supra,* 23 Cal.3d at p. 426, fn. 16.)

### 5. *Cumulative Error*

As in the guilt phase, we find virtually no merit to defendant's individual assignments of error. Accordingly, we reject his claim of cumulative prejudice as well.

### 6. *Constitutional Challenges to the Death Penalty*

Defendant raises several challenges to the constitutionality of California's death penalty statute. We have previously resolved these issues against defendant and decline to reconsider our analysis. In sum, our capital sentencing scheme does not contain so many special circumstances that it fails to perform the constitutionally mandated narrowing function. (*People* v. *Ray* (1996) 13 Cal.4th 313, 356-357 [52 Cal.Rptr.2d 296, 914 P.2d 846]; see also *People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 465-468 [24 Cal.Rptr.2d 808, 862 P.2d 808].) Nor does the felony-murder rule falter in this regard. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 946 [269 Cal.Rptr. 269, 790 P.2d 676].) The statutory categories have not been construed in an unduly expansive manner. (*People* v. *Crittenden, supra,* 9 Cal.4th at pp. 154-156.) The breadth of the prosecutor's discretion in choosing to seek the death penalty does not render it unconstitutional. (*People* v. *Stanley, supra,* 10 Cal.4th at p. 843.) The jury need not make express findings with respect to circumstances in aggravation (*People* v. *Jackson, supra,* 13 Cal.4th at p. 1246), or find beyond

a reasonable doubt that death is the appropriate penalty (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1101 [25 Cal.Rptr.2d 867, 864 P.2d 40]).

### D. *New Trial Motion*

Following the penalty verdict, Defense Attorney William Cater requested the court appoint new counsel for the purpose of making a new trial motion that might involve issues of ineffective assistance at trial. In camera, Cater indicated he thought the investigation for both the guilt and penalty phases had been deficient due to inadequacies on the part of the investigative agency retained by prior trial counsel, Charles Soria. Because Cater had represented defendant at both the guilt and penalty phases, he felt it was inappropriate for him to argue ineffective assistance in the context of a new trial motion. Defendant did not express dissatisfaction with Cater during any of the proceedings. Relying on the standard set forth in *People* v. *Stewart* (1985) 171 Cal.App.3d 388 [217 Cal.Rptr. 306],[16] the court denied the request because the defense did not present a "colorable claim" the assistance of another attorney was necessary for the new trial motion. (See 171 Cal.App.3d at pp. 396-397.) In the court's view, Soria's representation was adequate, "and I certainly don't think by any stretch of the imagination that any more favorable determination would have occurred."

"When, after trial, a defendant asks the trial court to appoint new counsel to prepare and present a motion for new trial on the ground of ineffective assistance of counsel, the court must conduct a hearing to explore the reasons underlying the request. [Citations.] If the claim of inadequacy relates to courtroom events that the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. [Citation.] If, on the other hand, the defendant's claim of inadequacy relates to matters that occurred outside the courtroom, and the defendant makes a 'colorable claim' of inadequacy of counsel, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial. [Citations.]" (*People* v. *Diaz* (1992) 3 Cal.4th 495, 573-574 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

At the in camera portion of the proceedings, Cater cited only two reasons defendant's representation may have been incompetent: In Cater's view, the case was not properly investigated because the defense investigator had not

---

[16]In *People* v. *Smith* (1993) 6 Cal.4th 684, 696 [25 Cal.Rptr.2d 122, 863 P.2d 192], this court disapproved *Stewart* to the extent it suggested a defendant has a greater right at the later stage of a trial to substitute counsel under *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]. The same standard applies equally preconviction and postconviction. (*People* v. *Smith*, *supra*, 6 Cal.4th at p. 694.)

adequately interviewed witnesses, had been intoxicated when he did so, and had not personally contacted other potential witnesses. Additionally, an investigator apparently had misappropriated funds belonging to defendant, which were subsequently returned to him after he complained. Cater also referenced defendant's complaints to the trial court at the end of the guilt phase, which prompted the court to grant a *Marsden* motion and relieve Soria. (*People* v. *Marsden, supra,* 2 Cal.3d at p. 123.)

At the *Marsden* hearing, defendant had asserted that the shootings were the responsibility of several other individuals possibly in confederacy with Mincy and Wilson to steal his marijuana and that he himself had been wounded in the incident. Although he had given Soria names and addresses of some of the alleged assailants as well as names and addresses of persons to whom he had shown his wounds after he left Kern County, Soria failed to call any of them to testify at trial. Defendant also complained discussions he had with Soria had become known to the prosecutor possibly through some breach of confidentiality on the part of the defense investigator. Soria responded that he had investigated or attempted to investigate the witnesses provided by defendant, with inconclusive results. In particular, medical information indicated defendant's wounds were inconsistent with his description of the events. Soria also did not think the investigator had been the source of any leaks. He acknowledged, however, that he and defendant were in conflict. The court found no substance to defendant's complaints, but nevertheless determined a breakdown in the attorney-client relationship jeopardized defendant's right to a fair trial and therefore relieved Soria.

On this record, we find no abuse of discretion in the trial court's refusal to appoint new counsel to prepare and present a new trial motion. The court originally concluded, and later reiterated, that Soria's representation was not inadequate. Because it was able to observe his trial performance, we defer to that assessment absent contrary evidence. (*People* v. *Diaz, supra,* 3 Cal.4th at p. 574.) With respect to Cater's concern about the adequacy of penalty phase investigation, the record contains no colorable claim that it was in fact deficient. At best, he offered only speculation based on hearsay reports, and defendant added nothing to substantiate the allegation. Accordingly, the trial court properly declined to replace Cater for a new trial motion. (*Ibid.*) The court also properly refused to appoint additional counsel for that purpose. As we have noted before, no authority supports the appointment of "simultaneous and independent, but potentially rival, attorneys to represent defendant." (*People* v. *Smith, supra,* 6 Cal.4th at p. 695.)

## III. DISPOSITION

The judgment is affirmed in its entirety.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

Appellant's petition for a rehearing was denied August 12, 1998, and the opinion was modified to read as printed above.