Filed 7/15/15  P. v. Medina CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B257086 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA130267) |
| v. | |
| ANDRES GARCIA MEDINA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Raul Anthony Sahagun, Judge.  Affirmed.

Randy Short for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Andres Garcia Medina appeals his judgment of conviction on multiple counts of sexual abuse of a child under the age of 14 years (Pen. Code,[1] §§ 269, subd. (a)(5), 288, subd. (a), 289, subd. (j)). Medina's sole contention on appeal is that he received ineffective assistance of counsel in violation of his constitutional rights because his trial counsel failed to adequately cross-examine the prosecution's witnesses and failed to present expert testimony on false confessions. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Charges

The Los Angeles County District Attorney charged Medina with five counts of lewd and lascivious acts upon a child under the age of 14 years (§ 288, subds. (a), (b)(1)), four counts of sexual penetration of a child under the age of 14 years (§ 289, subd. (j)), and four counts of aggravated sexual assault of a child under the age of 14 years (§ 269, subd. (a)(5)). Following Medina's plea of not guilty to each count, his case was tried to a jury in January 2014.

### II. Prosecution Evidence

#### A. The Initial Disclosure of Sexual Abuse

D.D., the victim in this case, was 12 years old at the time of trial. Medina is the fiancé of D.D.'s mother and the father of D.D.'s younger half-siblings. D.D. lived with Medina, her mother, her two older brothers, and her two younger half-sisters in a house in Los Angeles County. When she was in the sixth grade, D.D. told two friends from school that Medina had been sexually molesting her. A report of suspected child sexual abuse was thereafter made to the Los Angeles County Sheriff's Department.

---

[1] Unless otherwise stated, all further statutory references are to the Penal Code.

**B.      The Police Investigation**

On May 21, 2013, Los Angeles County Deputy Sheriff Luis Acosta interviewed D.D. at her home.  D.D. told the deputy that Medina had been touching her private area since she was 10 years old, and that the touching occurred when they were alone in the family's home or in Medina's car.  She recounted that Medina usually would begin by caressing her face and then would fondle her chest area, buttocks, and genitals.  On several occasions, Medina reached into D.D.'s pants and pushed his fingers inside her genitals, which caused her discomfort and pain.  He also reached under her shirt and fondled her bare chest.  On several other occasions, while D.D. was asleep in the living room, Medina caressed her buttocks with his hand and then pushed his penis against her buttocks over her clothing.  D.D. reported that the last time Medina inappropriately touched her was the day before when he fondled her buttocks over her clothes while her mother was asleep.  Following the interview with D.D., Deputy Acosta placed Medina under arrest.

Los Angeles County Sheriff's Detective Kenelma Hernandez was the lead investigator on the case.  On May 22, 2013, the day after Medina's arrest, Detective Hernandez interviewed D.D.'s mother, Lisette G., at the family's home.  Lisette denied any knowledge that Medina had been molesting D.D.  Lisette acknowledged, however, that a few months earlier, D.D. had said that she was scared of Medina, did not like being alone with him, and wanted to move to another city.

Detective Hernandez thereafter conducted two interviews with D.D. about the sexual abuse allegations.  In the first interview held on May 22, 2013, D.D. disclosed that Medina began touching her private area when she was 10 years old.  She recounted that he would caress her legs with his hand and move his hand in an up and down motion until it was close to her private area.  He then would put his hand under her pants, rub her vagina with his hand, and insert his fingers inside her vagina, causing her pain.  D.D. would try to close her legs in response, but Medina would force them open with his hand.  Medina inserted his fingers inside her vagina approximately 10 times and the first incident occurred around November 2012.  D.D. also disclosed that Medina would touch

3

her breasts under her clothes. In addition, Medina would call D.D. to lie down next to him while her mother was in the shower. He then would pull down D.D.'s pants and rub his covered penis against her buttocks. In the second interview held the following day, D.D. repeated these statements to Detective Hernandez. D.D. also reported that, on one occasion, Medina pulled down her pants, took out his penis, and began moving it against her buttocks. D.D. indicated that the last incident of inappropriate touching occurred on the day of Medina's arrest.

On May 22, 2013, Detective Hernandez met with Medina at the police station. After advising Medina of his *Miranda* rights, Detective Hernandez conducted a tape-recorded interview with him about D.D.'s allegations.[2] Early in the interview, Detective Hernandez told Medina falsely that D.D. had taken a lie detector test. She also told him that the test showed that D.D. was telling the truth.

During the interview, Medina admitted that there were occasions when he touched D.D. inappropriately. He stated that D.D. was [his] baby girl and . . . she courted [him] and . . . [he] would play with her," but he "never saw it [as] . . . wrong." Medina indicated the touching began one night when D.D. was asleep on the couch, and out of curiosity, he touched her buttocks and vagina with his hand. He admitted that there were other occasions when he placed his fingers on D.D.'s vagina, but denied that it occurred as many as 10 times. He stated that it was more like three times. He also acknowledged that there were a couple of times when D.D. tried to close her legs as he was touching her vagina, and that he opened them with his hand. In addition, Medina admitted that he touched D.D.'s breast under her shirt a couple of times, but denied it happened in the car. He stated that, when they were in the car, he merely would tickle D.D. and ask her to give him a kiss. Medina further admitted to lying next to D.D. on the bed or couch and rubbing his erect penis against her buttocks, but insisted there was no penetration and

---

[2] At trial, the audio recording of Medina's interview was played for the jurors and a written transcription of the recording was provided to them.

4

they were both clothed at the time. However, he acknowledged that, on those occasions, D.D. could feel his penis against her and that it made the child uncomfortable.

Medina told Detective Hernandez that could not explain "what the hell happened to [him]" when he engaged in these acts. He stated that he accepted responsibility for what he had done and would not deny it because "the mess would get bigger" and D.D. would "suffer more." He also expressed concern that, if he denied the sexual abuse, the police would continue to investigate the matter and "then what's going to happen to [his] children." Medina indicated that he hoped D.D. would forgive him because it was not his intention to hurt her and he now regretted the incidents. He told Detective Hernandez, "You don't have to put [D.D.] on a lie detector; she is a very innocent girl and good."

### C. The Trial Testimony

The prosecution called D.D. as a witness at trial. During her trial testimony, D.D. denied that Medina ever touched her in a sexually inappropriate manner. She also denied that she was ever scared of Medina or disliked being alone with him. D.D. acknowledged that she had accused Medina of molesting her in her initial interview with Deputy Acosta, and in her two subsequent interviews with Detective Hernandez. However, D.D. testified that, on each of those occasions, she had lied to the interviewing officer about the sexual abuse. When asked by the prosecutor why she had lied, D.D. responded, "Because every school I go I always get picked on. And I just want to fit in, but it doesn't work. So that's why I . . . lied to everybody. . . . It wasn't true. I just want to say that I'm sorry."

During cross-examination, D.D. elaborated on why she had told her friends at school that Medina was molesting her. As testified by D.D., she made up a story about sexual abuse because she was being bullied by some girls at school and was trying to fit in with them. She believed that if she told the girls that she was being abused, they would feel sorry for her and would stop bullying her. D.D. also testified that, a week before she spoke to the police, she had a meeting with her school counselor. During the meeting, D.D. disclosed the problems she was having with the girls at school, but she never said that Medina was abusing her. Instead, D.D. told the counselor that "things

5

were going well at home." D.D. further testified that, around the time she told the girls at school that she was being abused, Medina had taken away her cell phone for not helping around the house. D.D. admitted that she was angry when Medina took away her cell phone and that her story of sexual abuse "was kind of a little bit from that." At some point after D.D. spoke to the police, she wrote a letter in which she admitted to lying about the abuse. She then gave the letter to her aunt, who shared it with D.D.'s mother. In response to defense counsel's questioning, D.D. reiterated that she was now certain that Medina had never touched her inappropriately.

D.D. mother, Lisette, also was called to testify at trial. According to Lisette, Medina had a good relationship with D.D., he "was always playing with everybody," and "nothing was . . . ever wrong." Medina would discipline D.D. by taking away her cell phone when she did not help take care of her younger siblings, but that only happened two or three times. Lisette denied that D.D. ever told her that she was being abused by Medina, that she was afraid of him, or that she did not like being alone with him. Lisette admitted that she told Detective Hernandez that D.D. once said she was scared of Medina, but noted that D.D. had made that statement when Medina took away her cell phone. Lisette acknowledged that she had lived with Medina for eight years, and during that time, he was the sole financial support for the family.

On cross-examination, Lisette testified that the first time she became aware of D.D.'s sexual abuse allegations was when a law enforcement officer came to her home. The officer insisted that Lisette had prior knowledge of the abuse despite her repeated denials, and threatened to take her children from her. At some point, after Lisette talked to D.D. about the importance of telling the truth, D.D. admitted to Lisette's sister-in-law in a letter that she had lied about the sexual abuse. Shortly thereafter, Lisette contacted Detective Hernandez and the district attorney's office to inform them that D.D. had admitted to lying, but they decided to continue with the case.

### III. Defense Evidence

Medina testified on his own behalf. He denied that he ever touched D.D. in a sexually inappropriate manner. He stated that he had a good relationship with D.D. and regarded her as his daughter. According to Medina, on the day of his arrest, he was never told by Deputy Acosta or any other law enforcement officer why he was being taken into custody. Once he was placed in a cell, he was told by another detainee that, based on the color of the wrist band he had been issued, his arrest was for child abuse. The other detainees also told Medina that the authorities were going to take his children away and place them for adoption. Because Medina and Lisette previously had lost a baby who died following a premature birth, he was concerned about how Lisette would cope if her children were taken from her. Medina did not sleep at all the night of his arrest because he was worried about what would happen to his children.

The morning after his arrest, Medina was interviewed by Detective Hernandez. He testified that, when he told the detective that he had touched D.D.'s breasts, buttocks, and vagina, he meant that he might have unintentionally touched D.D. while they were playing together. He denied ever touching D.D. for sexual gratification. Medina further testified that, when he told the detective that D.D. must be telling the truth, he meant that D.D. may have misinterpreted some of his actions toward her. He explained that he had an affectionate relationship with each of his children, including D.D., and he would hug and kiss D.D. in the same way that he would hug and kiss his other children. He also stated that his mind was "not working a hundred percent" during the police interview and he misunderstood some of Detective Hernandez's questions. Medina repeatedly denied in his trial testimony that he ever sexually abused D.D.

### IV. Verdict and Sentencing

The jury found Medina guilty of 12 of the 13 counts. He was found not guilty of one count of lewd or lascivious act upon a child. Following the verdict, the trial court sentenced Medina to a total term of 36 years to life in state prison. Medina thereafter filed a timely notice of appeal.

7

Medina argues that he received ineffective assistance of counsel in violation of his federal and state constitutional rights. He specifically contends that the performance of his trial counsel was constitutionally deficient because counsel (1) failed to adequately cross-examine D.D. and Lisette on issues pertaining to D.D.'s credibility, and (2) failed to call an expert witness to testify on the factors influencing false confessions. He also claims that his trial counsel's deficient performance was prejudicial.

## I.     Governing Legal Principles

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution." (*People v. Doolin* (2009) 45 Cal.4th 390, 417.) "A criminal defendant's federal and state constitutional rights to counsel [citations] include the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; see *Strickland v. Washington* (1984) 466 U.S. 668, 694.) The defendant "'must establish "prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel."'" (*In re Cox* (2003) 30 Cal.4th 974, 1016.)

"'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.] . . . . "'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.'" [Citation.]'

[Citation.]  If the record on appeal "'"sheds no light on why counsel acted or failed to act in the manner challenged[,] … unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected,"' and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.'  [Citation.]"  (*People v. Vines* (2011) 51 Cal.4th 830, 876; see also *People v. Lucero* (2000) 23 Cal.4th 692, 728-729 ["'[b]ecause the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, not on appeal'"].)

## II.  The Scope of Cross-Examination of the Prosecution's Witnesses

Medina asserts that he received ineffective assistance of counsel because his trial counsel failed to adequately cross-examine D.D. and her mother about D.D.'s motive to lie about being sexually abused and other matters relevant to her credibility.  However, as the California Supreme Court has observed, "normally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make."  (*People v. Cleveland* (2004) 32 Cal.4th 704, 746.)  "'As to whether certain witnesses should have been more rigorously cross-examined, such matters are normally left to counsel's discretion and rarely implicate inadequacy of representation.  [Citations.]'" (*People v. Bolin* (1998) 18 Cal.4th 297, 334; see *People v. Cudjo* (1993) 6 Cal.4th 585, 618 ["failure of defense counsel to cross-examine more vigorously may be explained as a tactical decision"].)  Moreover, "'[s]uch claims must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused.  [Citations.] We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.'  [Citations.]"  (*People v. Bolin*, *supra*, at p. 334.)

### A.  Cross-Examination of D.D.

Medina first challenges his counsel's failure to ask D.D. more detailed questions about her motive to lie about being sexually abused.  In particular, Medina contends that

9

his counsel should have asked D.D. more about the nature and extent of the bullying she was experiencing at school and the effect it had on her emotional state. However, the record reflects that there may have been sound tactical reasons for counsel's decision to forego more rigorous cross-examination of D.D. about her motive for making a false accusation. On direct examination, D.D. identified her history of being "picked on" at school as her motive for lying, but she was unable to articulate how such bullying had led her to accuse Medina of sexual abuse. By asking focused and leading questions on cross-examination, Medina's counsel was able to elicit testimony from D.D. that she had lied specifically to gain sympathy from the girls who were bullying her so that the bullying might stop. When counsel asked D.D. to describe the nature of the bullying, however, she struggled with her response, stating: "Well, kind of like – it's like – like when I met them, I thought they were, like, true friends. But they seemed that they didn't work out so it didn't work for me. So – So, like, my – I have like, three of them that didn't really like me. So that's why I kept going on to be friends with them, but it just didn't work." In light of such testimony, there was a risk that D.D. might further minimize the nature of the bullying and how it affected her if asked more probing questions on the subject.

Medina also claims that his trial counsel should have explored a possible link between D.D.'s discussion with a school counselor about whether she was being sexually abused and her decision to accuse Medina of molesting her. However, the testimony elicited at trial shows that there was no basis for counsel to explore such a link. D.D. testified that she told at least one friend from school that she was being sexually abused a "long time" before Medina's arrest. She further testified that she had the meeting with her school counselor about a week before the arrest. Thus, by the time D.D. met with the counselor, she already had told one or two classmates that Medina was molesting her. Given such testimony, trial counsel would not be able to show that it was the school counselor who first put the idea in D.D.'s head to fabricate a story of sexual abuse.

Medina next faults his trial counsel for failing to ask D.D. why she continued to lie about the sexual abuse during her interviews with the police. Medina asserts that the jury naturally would want an answer to this crucial question in assessing D.D.'s credibility.

10

While we agree that D.D.'s detailed statements to the police were a critical part of the prosecution's case, there was no guarantee that D.D. would give an answer favorable to the defense if asked about her motive for lying to them. Instead, there was a risk that D.D. might feel pressured to abandon her recantation because she could not justify lying to multiple officers on different occasions about a crime as serious as child sexual abuse. Counsel therefore rationally could have decided that such questioning might jeopardize Medina's defense and that the more sound trial strategy was to focus the jury's attention on D.D.'s subsequent recantation rather than on her initial statements to the police.

Medina further contends that his trial counsel should have introduced D.D.'s August 2013 preliminary hearing testimony in which she denied that Medina had ever molested her as a prior consistent statement under the Evidence Code. However, "'[t]o be admissible as an exception to the hearsay rule, a prior consistent statement must be offered (1) after an inconsistent statement is admitted to attack the testifying witness's credibility, where the consistent statement was made before the inconsistent statement, or (2) when there is an express or implied charge that the witness's testimony recently was fabricated or influenced by bias or improper motive, and the statement was made prior to the fabrication, bias, or improper motive. (Evid. Code, §§ 791, 1236.)' [Citation]" (*People v. Lopez* (2013) 56 Cal.4th 1028, 1065.) D.D.'s preliminary hearing testimony was not admissible under the first exception because it occurred *after* her May 2013 statements to the police accusing Medina of sexual abuse. It also was not admissible under the second exception because it occurred *after* the motive for recanting the sexual abuse allegations would have arisen. (*Id.* at p. 1067 ["a prior consistent statement is admissible to corroborate later testimony which is . . . alleged to have been fabricated if the prior consistent statement was made before the motive for fabrication arose"].) Indeed, by the time D.D. testified at the preliminary hearing, she already had recanted her statements to the police and told her family that she had lied about Medina molesting her. On this record, Medina has failed to demonstrate how any of his trial counsel's tactical decisions in cross-examining D.D. fell below an objective standard of reasonableness.

11

## B. Cross-Examination of D.D.'s Mother

Medina also challenges the adequacy of his trial counsel's cross-examination of D.D.'s mother, Lisette, about D.D.'s possible motive for lying about the molestation. Medina claims that his counsel should have asked Lisette specific questions about the bullying that D.D. was experiencing at school and the emotional impact that it had on her. However, the record does not demonstrate that Lisette had any knowledge of such bullying or had observed any changes in D.D.'s behavior that caused her concern. Trial counsel thus may have had a sound tactical reason for foregoing this line of questioning, particularly if Lisette could not corroborate D.D.'s testimony that she was being bullied by her schoolmates and made up a story of sexual abuse to gain their sympathy.

Medina next asserts that his trial counsel should have introduced the letter that D.D. wrote to her family in which she admitted to lying about the sexual abuse. Medina reasons that the letter could have bolstered D.D.'s credibility at trial by supporting her recantation. The contents of the letter, however, constituted inadmissible hearsay and did not qualify as a prior consistent statement under the Evidence Code. Like D.D.'s preliminary hearing testimony, the statements in her letter were made *after* her initial statements to the police accusing Medina of sexual abuse, and *after* her motive for recanting the sexual abuse allegations would have arisen.[3] On this record, trial counsel's failure to offer the letter into evidence as an exhibit was not objectively unreasonable.

Medina further argues that his trial counsel should have cross-examined Lisette about whether she ever observed any physical signs of sexual abuse in D.D., such as unexplained bleeding, bruising, or pain in the child's vaginal area. Medina asserts that, if

---

[3]     Even assuming that the letter was admissible, Medina's counsel could have made a tactical choice not to offer it into evidence because its essential contents already had been disclosed to the jury. In his cross-examination of D.D. and Lisette, counsel was able to elicit testimony showing that, within a few weeks of D.D.'s statements to the police, she recanted her sexual abuse allegations by writing a letter to her aunt in which she admitted that she had lied about the sexual abuse. Counsel also was able to show that Lisette notified both the investigating officer and the district attorney's office of D.D.'s recantation as soon as she became aware of the letter.

Lisette had testified that she never saw any physical signs of molestation, it would have supported D.D.'s testimony that the molestation never occurred. However, Medina's counsel rationally could have decided that it was unnecessary to delve into this area on cross-examination because Lisette already had testified that she was unaware of any molestation occurring and that "nothing was . . . ever wrong" with D.D. Given the nature of the sexual abuse that D.D. described to the police, counsel also reasonably could have concluded that Lisette's failure to observe any physical signs of sexual trauma in D.D. was not probative on the issue of whether such abuse occurred.

As our Supreme Court has observed, "[r]igorous cross-examination risks eliciting damaging redirect examination. Whether to run that risk is a tactical choice counsel must be permitted to make." (*People v. Cleveland*, *supra*, 32 Cal.4th at p. 747.) In this case, the record fails to establish that Medina's trial counsel lacked any rational tactical basis for foregoing or limiting certain lines of questioning in his cross-examination of D.D. and Lisette. Accordingly, Medina's claim that he received ineffective assistance of counsel based on how his trial counsel cross-examined these witnesses fails on direct appeal.

## III. The Failure to Call an Expert Witness on False Confessions

Medina argues that his trial counsel also rendered ineffective assistance in failing to present expert testimony on the factors influencing false confessions. Medina asserts that an expert witness could have helped the jury understand how police-induced false confessions occur, which would have supported his defense that he was induced into falsely confessing to Detective Hernandez that he had molested D.D. However, whether to call certain witnesses is ordinarily a matter of trial tactics left to counsel's discretion unless the decision results from an unreasonable failure to investigate. (*People v. Bolin*, *supra*, 18 Cal.4th at p. 334; see also *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 ["[t]he decisions whether . . . to put on witnesses are matters of trial tactics and strategy which a reviewing court generally may not second-guess"].) Furthermore, a defendant claiming ineffective assistance of counsel based on the failure to call an expert witness

13

"must do more than surmise that defense experts *might* have provided more favorable testimony." (*People v. Lucas* (1995) 12 Cal.4th 415, 448, fn. 5.)

The record on appeal does not affirmatively demonstrate that Medina's trial counsel lacked any reasonable tactical basis for declining to present expert testimony on false confessions, and there may have been sound strategic reasons for counsel's decision not to call an expert. Counsel may have concluded that he could more effectively attack the alleged coercive techniques used in the interrogation of Medina through his cross-examination of Detective Hernandez. Counsel also may have concluded that the factors which could have induced Medina into making a false confession, such as lack of sleep, concern about the welfare of his children, and misrepresentations about D.D. taking a lie detector test, were within the jury's common understanding and could be effectively argued to the jury without the aid of expert testimony. (See *People v. Son* (2000) 79 Cal. App.4th 224, 241 [where defendant's stated reasons for falsely confessing to the police were "a matter easily understood by a layperson without expertise[,] . . . expert evidence bearing on other potential reasons for false confessions was unnecessary"].) There was also a risk that an expert might provide testimony on cross-examination that would be unfavorable to Medina's defense.

"That we can hypothesize a reasonable tactical basis for defense counsel's conduct does not, of course, prove that counsel did have a reasonable tactical basis for his action or inaction. But to support a claim of ineffective assistance of counsel, defendant must prove that counsel had no such tactical purpose. [Citation.]" (*People v. Jones* (2003) 30 Cal.4th 1084, 1122.) Here, the record on appeal does not affirmatively show the absence of any rational tactical purpose for trial counsel's challenged actions or omissions. Therefore, for purposes of appeal, we reject Medina's ineffective assistance of counsel claim and conclude that it is more appropriately decided in a habeas corpus proceeding.

## DISPOSITION

The judgment is affirmed.


ZELON, J.


We concur:



PERLUSS, P. J.



IWASAKI, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.