Filed 7/27/15  P. v. Rodriguez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE, | C074639 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F06377) |
| v. | |
| DEVENNE MARQUIS RODRIGUEZ, | |
| Defendant and Appellant. | |

Defendant Devenne Rodriguez arranged to meet Adrian Augusta to purchase a dime bag of marijuana from Augusta.  Instead of purchasing marijuana, defendant and codefendant Sherston Miles robbed, shot, and killed Augusta.  After a joint trial with separate juries, defendant Rodriguez was convicted of first degree murder and robbery.[1] The jury found true the special circumstance allegation that the murder was committed during the commission or attempted commission of a robbery and the allegation that defendant was armed during the offenses.  The trial court sentenced defendant to life without the possibility of parole plus a one-year determinate term for being armed.

---

[1] Miles eventually pleaded nolo contendere to second degree murder.

Defendant argues there was insufficient evidence that he formed the intent to rob Augusta before or during the killing, thus insufficient evidence to convict him of first degree murder on a felony-murder theory. He also argues the trial court should not have imposed a parole revocation fine, since he was sentenced to life without the possibility of parole, and that the trial court erred when it failed to indicate liability for the direct victim restitution fine was joint and several with his codefendant.

We find no merit to defendant's arguments, and shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Around August 19, 2011, one week before the murder, defendant began dating Cherah Mondello. She was living in an apartment complex on 47th Avenue in Sacramento. About a week before they started dating (two weeks before the murder), Mondello and defendant were at the apartment of Mondello's friend, who lived in the same apartment complex. Mondello saw defendant in her friend's closet with a revolver.

Mondello knew defendant's friend Miles. Since defendant did not have a car, Miles would sometimes give defendant a ride in his silver Lexus.

Mondello had a daughter named A. A.'s best friend Alexis lived in the same apartment building as Mondello and A. Alexis was 15. Alexis saw defendant at A.'s house every other day. Alexis would drink and smoke marijuana with defendant. Alexis had known the victim, twenty-year-old Adrian Augusta, a year or two, and she purchased marijuana from him.

Around 11:00 p.m. on August 25, 2011, Alexis was at A.'s apartment with Mondello and defendant. They were all smoking marijuana, and she, A., and defendant were also drinking alcohol. At some point, Mondello left. They ran out of marijuana, so Alexis called Augusta and told him one of her friends was trying to get some marijuana. Augusta told Alexis to give her friend his number. Alexis gave defendant Augusta's phone number so he could purchase more marijuana for her, and watched as defendant

2

called Augusta. He used a gray Android phone. Alexis gave defendant $10 to buy the marijuana. Defendant left the apartment, and got into a white, four-door car.

Augusta was at home with his younger brother until about 12:15 a.m. Augusta said he was going to go "sell some weed around the corner." Augusta left carrying his burgundy Kyocera cell phone and a dime bag of marijuana. At 12:16 a.m., Augusta sent a text to Alexis, telling defendant to hurry up because he would be going to sleep in a minute and not coming out.

Around 12:45 a.m. Anna Carillo, who lived on the corner of 43rd Street and 37th Avenue, heard what sounded like a firecracker and looked out her bedroom window. She saw what looked like a large bag fall into the gutter. Someone ran from the area of what she thought was the bag and got into a gold-brown car. The car sped off. Carillo later identified pictures of Miles's car as similar to the gold car she saw, although she thought the car looked darker when she saw it at night. She went to the bag in the gutter and discovered it was a body. She went back into the house and called 911. Before the emergency personnel arrived, she watched from the house as a white car pulled up. It stopped for about two minutes, then sped off.

When defendant went back to Alexis he was sweating and looked upset. He was carrying a burgundy Kyocera cell phone. He said, "I shot that nigga blood. Don't text his phone. Don't call him. Don't do nothing." Then defendant left, and Alexis never saw him again.

Mondello had gone out that evening with a friend in the friend's white BMW. Mondello was with her friend at a bar when she received a call from defendant sometime after midnight telling her she needed to come home now. Defendant sounded anxious. Mondello took her friend's white BMW, leaving her friend at the bar. After she picked defendant up, they drove by the dead body, where defendant got out of the car and went over to the body before getting back into the car.

3

Emergency personnel discovered Augusta's body lying face-down in the street with his shorts pulled down to mid-thigh, exposing his buttocks. There was no wallet or any other property on the body. A baggie containing marijuana was discovered on a sidewalk about 25 feet from the body in a very dark area. No shell casings were found, indicating the gun used was a revolver, rather than a semi-automatic.

The cause of Augusta's death was a gunshot wound to the back, which severed the spinal cord and lodged in the neck, instantly rendering Augusta a quadriplegic, and resulting in death within a few minutes.

Later that day, at 11:34 a.m., Miles sent a text message to defendant that said "I already checked dat nigga."[2] Defendant replied, "Whts goin on brah[?]" Miles replied, "Everything good bru just layin low you good tho."

At 1:54 p.m., defendant sent the following text message to Alexis: "Please man do exactly wht I said and erase my text and shit ok please and b coo nigga." Seven minutes later, defendant sent Alexis another text that said, "I told u do not say shit at all dnt even bring me up itll b good ok ull b fine just listin please."

DISCUSSION

I
Sufficient Evidence of Intent to Rob

The prosecution relied on a theory of felony murder in count one. Accordingly, the trial court correctly instructed the jury: "The defendant is charged in Count One with murder under the theory of felony murder. To prove the defendant is guilty of first-degree murder under this theory, the People must prove that, one, the defendant committed robbery or attempted robbery; two, the defendant intended to commit robbery or attempted robbery; and, three, while committing robbery or attempted robbery, the

---

[2] Detective Stanley Swisher testified this most likely meant "I put that person in place or I've checked that person, that everything is all good with that person over there."

4

defendant caused the death of another person. A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent."

A person is not guilty of felony murder if he forms the intent to commit the felony, in this case robbery, only after the killing occurred. (*People v. Lewis* (2001) 25 Cal.4th 610, 647.) Defendant argues there was insufficient evidence to prove he formed the intent to rob Augusta before or during the act of killing him. He finds it important that there was no evidence of what transpired in the moments leading to the shooting, thus no evidence he intended to rob Augusta before the shooting.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

A number of defendant's text messages were admitted into evidence from which the jury could have drawn an inference that defendant formed an intent to rob Augusta prior to or during the commission of the murder.

Around August 15, defendant came back from Las Vegas, where he had spent all of his money. Defendant sent Mondello a text complaining that he was broke and needed money. On August 19, defendant sent a text message to a person whose moniker was Ca$hDaddyOut. When asked what he was doing that day, defendant told Ca$hDaddyOut that he was "trina get sum doe." Detective Stanley Swisher testified that this meant that defendant was trying to get some money. Ca$hDaddyOut asked defendant, "Yall got anymore thump thangz?" Detective Swisher testified a "thump thang" is a weapon or gun. Defendant replied, "I got another but not fo [sale] u got any lics blood[?]" Detective Swisher testified a lick is a common term for a robbery.

5

Defendant also sent a series of texts right around the time of the murder. At 12:16 a.m. Augusta, the victim, sent the text to Alexis telling defendant to hurry. At 12:28 a.m., defendant sent a text to Miles saying, "Blood. Bring. tht nigga r it mite b bad." Detective Swisher testified that while nigga most often refers to a person, it can also be used as an object where both parties know what the object is. It could, for example, be used to refer to a gun, although Detective Swisher did not know the exact interpretation of the word in this case. At 12:35 a.m., Augusta sent a text to defendant asking where he was. At 12:43 a.m., defendant sent a text to Augusta, saying, "Im here." At 12: 47 a.m., Augusta again asked, "w[h]ere u at[?]"

Also, the afternoon after the murder, and just after defendant warned Alexis in a text to "not say shit," Alexis sent defendant a text complaining that defendant had not even done what he said he was going to do, because defendant took "his" phone and not "his" marijuana. Defendant responded that he got something, but they would talk about it later.

The jury could reasonably infer from the above evidence, that defendant was broke and looking for robberies to commit in order to make money. The jury could infer that defendant found his opportunity to rob someone when Alexis set him up with her marijuana dealer, and that defendant told Alexis before the murder that he would take Augusta's marijuana from him. The jury could further infer that defendant made arrangements with Miles to help him rob Augusta and to bring a gun to the meeting with Augusta. All of these reasonable inferences, plus the complete lack of a motive to simply murder Augusta, are sufficient evidence to sustain the judgment.

## II
## Parole Revocation Fine was Proper

Defendant argues the trial court improperly imposed and suspended a $10,000 parole revocation restitution fine under Penal Code section 1202.45, subdivision (a).[3] Citing *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, he argues the fine is not appropriate here because he was sentenced to life without the possibility of parole. *People v. Oganesyan* held that where only a sentence of life imprisonment without the possibility of parole is imposed, the fine is not applicable. (*Id*. at p. 1183.)

However, the Supreme Court has determined that where a defendant's sentence includes a determinate term, the parole revocation restitution fine is mandated by statute. Thus, where the defendant was sentenced to death plus a determinate prison term, the fine was required. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075.) Furthermore, a defendant is not prejudiced by the assessment of the fine, which becomes payable only if he begins serving a period of parole and his parole is revoked. (*Ibid*.)

Here, defendant received a determinate one-year prison term for the section 12022, subdivision (a)(1) arming enhancement in addition to the sentence of life without the possibility of parole. Thus, because defendant was sentenced to a determinate term, the parole revocation restitution fine was properly imposed.

---

[3] Further statutory references to sections of an undesignated code are to the Penal Code.

Section 1202.45, subdivision (a) provides: "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."

## III
## Joint and Several Liability on Victim Restitution

Defendant and Miles were tried together, but with separate juries and separate sentencing. The trial court ordered defendant to pay $11,795.39 in direct victim restitution to the victim's mother. This amount included compensation for 25 days of lost wages to attend the trial. At the sentencing hearing, defense counsel contested the number of trial days for which compensation was requested because the trial had not lasted that long. The trial court stated: "I remember in connection with the sentencing of Mr. Miles we did maybe correct it because -- this trial took place over a span of time. [¶] Do we get the number of court days? Did we -- I know with Mr. Miles we reduced that to some extent. [¶] . . . [¶] . . . [Y]ou remember this in the Miles trial, the trial really wasn't 25 days. I think probation just took the start date and end date. So we're just trying to -- I know we figured that out in the Miles trial. [¶] How about we do this. How about I impose this amount, but with the understanding that we will reduce it to reflect the actual number of days in trial. Anybody have any objection with that because we're probably not going to figure this out right now."

The court then set the order at $11,795.39 and put the burden on the defendant to make a motion to reduce it. There is no other information in this record regarding the victim restitution order in Miles's trial.

Defendant argues the trial court should have ordered the obligation be made joint and several with defendant Miles, otherwise Augusta's mother might reap an unjustified windfall as a result of the murder of her son.

Section 1202.4, subdivision (f) provides in part: "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." A trial judge has the authority to order joint and several liability

8

with respect to victim restitution orders, but is not required to do so.  (*People v. Arnold* (1994) 27 Cal.App.4th 1096, 1100.)

Defendant forfeited his claim by failing to raise it below.  "[A]ll 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' raised for the first time on appeal are not subject to review.  [Citations.]"  (*People v. Smith* (2001) 24 Cal.4th 849, 852.)  In any event, the claim is without merit.

As stated, the trial court is not required to provide that liability for a direct victim restitution order be joint and several.  Moreover, section 1202.4, subdivision (j) provides in part:  "Restitution collected pursuant to this subdivision shall be credited to any other judgments for the same losses obtained against the defendant arising out of the crime for which the defendant was convicted."  Thus, "if the combined payments made by multiple defendants exceed the victim's loss, each defendant would be entitled to a pro rata refund of any overpayment."  (*People v. Arnold, supra*, 27 Cal.App.4th at p. 1100.)

## DISPOSITION

The judgment is affirmed.

                                    BLEASE                    , Acting P. J.


We concur:


        BUTZ                    , J.


        MAURO                  , J.


9